SUNDAR, J.T.C.
This is the court’s opinion in connection with the above captioned matters. Plaintiffs challenge the assessments imposed by defendant Township of Belleville (“Belleville”) upon property located at 86 Lavergne Street, designated as Block 2401, Lot 2 (“Subject”) for tax years 2008, 2009, 2010, and 2011. The assessments for tax years 2008 through 2010 were as follows:
Ijinil SUSM.000
Improvements ...... S 241.800
TOTAL 81.905,800
The assessment for tax year 2011 was as follows:
Land S 1,6(54,000
Improvements_S 475.800
TOTAL 8 2,139,800*
The Chapter 123 ratio and the upper/lower limits for each tax year were as follows:
[[Image here]]
Each party presented an expert in the field of real estate appraisal who was accepted by the court as such. Based upon their respective conclusions, each expert’s value opinion of the Subject for each tax year was as follows:
*426 [[Image here]]

SUMMARY OF COURT’S FINDINGS

As further explained below, the Subject is a lot improved with a single-family residence. As of the assessment dates, it was owned by Silo, Inc., (“Silo”) with a life estate retained by the individual plaintiffs, Victor and Mary Aliotta, who resided in the residence portion of the Subject during the tax years at issue. Since Silo is the record owner of the Subject, this opinion will treat Silo as the lead plaintiff. Despite its reference only to Silo, the opinion should be deemed to include Victor and Mary Aliotta since they are also the named plaintiffs in the complaints. Mr. Aliotta passed away after the complaints were filed, and while they were pending.
The land behind the house is called the “Contractor’s Yard” and is leased out by Silo to various commercial tenants for parking their construction vehicles and/or trailers, and for storage. Additionally, in a prior ruling, this court held that two Trailers and a Quonset Hut located in the Contractor’s Yard were taxable as real property.
Both experts agreed that the highest and best use of the Subject was for its use as the Contractor’s Yard since it generated the most income to the Subject, which lay in the industrial zone. Silo’s expert opined that the residence was superfluous and detrimental to the Subject’s income earning potential. Belleville’s expert opined that the Subject’s use for a residence also met the four tests of the highest and best use. The court finds that the highest and best use of the Subject as vacant, and as improved, is its current use, namely, as a Contractor’s Yard (as improved), with the residence.
Silo’s expert used three valuation approaches: (1) a “blended” approach of both the sales comparison and income approach, giving minimal weight to the former approach, and allocating 20% of the comparable sales conclusion and 80% of the income ap *427 proaeh conclusion to value the Contractor’s Yard; (2) the cost approach for the Trailers and the Quonset Hut; and (3) an “extraction method” for valuing the residence by first using a sales comparison approach of other single-family homes, then extracting therefrom a ratio of the sales price of the improvement only based upon the allocation of the comparable’s assessment to improvements, and then arriving at a value for the residence based on the extracted sale price of the improvements. He theorized that all land on the Subject, including land comprising the residence area, was dedicated to the Contractor’s Yard.
Belleville’s expert used only the income approach for all of the components of the Subject. He used the contract rents for the Contractor’s Yard, and estimated rents for the remaining.
The court finds that the hybrid valuation approach is reasonable because of the Subject’s unique uses. The income approach is appropriate for the Contractor’s Yard since it is income producing. However, Silo’s expert’s sales comparison component of his blended approach for the Contractor’s Yard is not persuasive. Although he used it to develop the value of just the land, he used improved comparables, and made percentage adjustments to their sale prices for the differential in the gross building area (“GBA”) of the residence on the Subject. The reliability of the comparables were also suspect; the 20% allocation to this approach was purely subjective; and in any event, the approach was minimally weighted by the expert himself.
The cost approach is most appropriate for valuing the improvements in the Contractor’s Yard, ie., the Trailers and Quonset Hut. However, the income approach is appropriate for the Block Garage (or the second independent garage owned by Silo and included as taxable real property by both experts) because the income imputation for this item is not clouded by the issues of cost/impaet of tenant improvements or ground lease payments.
Silo’s expert’s summation approach for the residence attributes no value to the land upon which the residence is situated. Since the only approach where he opined a value for the entire fee simple interest in the Subject was his sales comparison approach *428 for valuing the Contractor’s Yard, which the court is not relying upon, and further since the expert’s income approach is based only upon contract rents which do not include rent for the land upon which the house is located, that land escapes valuation. Additionally, his allocation ratio is based upon the allocation of the comparable’s assessment which is improper. Even if the court could use the unadjusted sales prices of Silo’s expert’s comparable home sales as a basis for value conclusion (thus, ensuring that the entire land and improvements are valued), it has no details of the physical description of the comparables (site size, age, GBA size, garage count or the like) to ensure that the expert’s opinion of adequate comparability and zero adjustments is justified.
Belleville’s expert’s income approach for the house is more reasonable because it would provide a value to the land and building occupying the residence portion of the Subject. His rental comparables which include houses, contain a fuller description of their physical description, and have lease dates close to the assessment dates. The court can therefore use these rentals as the potential economic rent for the residence. However, the court will provide negative adjustments for the undisputed inferior condition and location of the residence.
Based on the above analysis, the court concludes the Subject’s value as $1,635,800 (2008); $1,735,400 (2009); and $1,996,455 (2011). The assessment for 2010 is affirmed.

PROCEDURAL HISTORY

Prior to trial, the court decided Silo’s in limine motion which requested striking portions of Belleville’s expert’s report as invalid on grounds it included certain personal property as real property, and as a net opinion because it deemed the attic in the residence as a bedroom.
After a plenary hearing, the court held that two trailers (hereinafter “White Trailer” and “Brown Trailer” and collectively “Trailers”) and a storage area styled as a Quonset Hut located on the Subject were taxable as real property because they were affixed to the land, and therefore must be considered in valuation the *429 Subject for purposes of local property taxation (but only for tax year 2010 onwards as to the Quonset Hut).
At trial, and after Silo’s case-in-chief, Belleville moved to dismiss the complaints for failure to overcome the presumption of correctness that attaches to an assessment as set forth in Pantasote Co. v. City of Passaic, 100 N.J. 408, 495 A.2d 1308 (1985) and Ford Motor Co. v. Township of Edison, 127 N.J. 290, 604 A.2d 580 (1992). The reasons included an attack on Silo’s expert’s valuation methodology, lack of credible comparable sales, and the quantum of computational or typographical errors in his reports. The court denied the motion. See MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J.Tax 364 (Tax 1998) (court should view all evidence with “rose-colored glasses” and view all inferences in favor of the non-moving party). The court was satisfied that Silo’s expert had presented sufficiently detailed testimony as to the basis and reasoning behind his valuation opinion, and Silo had thus provided more than “a scintilla” of evidence as required by MSGW, supra.
Silo’s post-trial brief argues that this court should bar admission of Belleville’s expert’s report as being a net opinion, and replete with hypothetical conditions, specifically that the expert assumed the residence located on the Subject to be income producing when in fact, and as of the dates of assessments herein, the same was owner occupied.
Evidence Rule 703 “requires an expert ‘to give the why and wherefore’ of his opinion, rather than mere conclusions.” Rosenberg v. Tavorath, 352 N.J.Super. 385, 401, 800 A.2d 216 (App.Div. 2002). Thus, “an opinion lacking in such foundation and consisting of bare conclusions unsupported by factual evidence is inadmissible.” Ibid.
Here, both experts agreed that the Subject’s highest and best use was its current industrial use. They further agreed that the most reliable methodology for valuing the Subject was the income approach. Silo’s expert also posited that the residence on the Subject was superfluous to the Subject’s maximally productive and legally permissible use. Thus, Belleville’s expert, using the *430 income approach, based his “whys and wherefores” on the Subject’s income producing potential to a hypothetical investor, the typical buyer of income producing property. See Herman Holding Corp. v. Borough of Montvale, 5 N.J.Tax 199, 202 (Tax 1983) (“a prospective investor” is primarily concerned with “the anticipated return on his investment,” thus, will naturally study “the income history of the property and considers its income producing potentiality”).
Consequently, Belleville’s expert credibly explained that a potential investor would consider renting the residence to maximize income production. Whether or not his income imputation to the house based on his comparable rentals, is credible, is a separate and distinct issue, thus, not requiring dismissal of the expert’s opinion as being “net.” Whether or not his income approach provides a reliable indicator of value of the Subject, given his highest and best use analysis, is also an issue for credibility.
The court thus finds that Belleville’s expert’s opinion is not an inadmissible net opinion, and his expert report and testimony will not be stricken. For the same reasons outlined above, the court also denies Silo’s motion to strike Belleville’s expert’s opinion and testimony as violating the Uniform Standard Principles of Appraisal Practice which require hypothetieals assumed in the valuation opinion be specifically stated.

FACTS

(A) PHYSICAL DESCRIPTION

The Subject is comprised of about 2.69 acres.[2] Located at the end of Lavergne Street in Belleville, it is considered a Class 4A *431 property. Originally owned by Victor and Mary Aliotta, they transferred the Subject to Silo for One Dollar, but retaining a life estate interest.
The Subject is irregular in shape. It is bordered by railroad tracks on its north side and Second River on the southeast. There is a railroad “right-of-way” that extends approximately 50 feet from the railroad tracks to the edge of the Subject and is unpaved. Along Second River, there is a 20 foot-wide easement belonging to Belleville, Bloomfield, East Orange, Glen Ridge, Montclair, Newark and Orange City which runs onto the Subject on its southern border. Belleville owns the parcel of land contiguous to the Subject (on the other side of Second River), plus another smaller parcel of land behind the Subject which is accessed through the Subject.
There is a single-family dwelling on the Subject where Victor and Mary Aliotta resided during the tax years at issue (and for the past 50 years). It is a two-story Colonial home, constructed sometime in the 1800’s, with four bedrooms, three bathrooms, two kitchens, an unfinished basement, an unfinished attic, two enclosed/heated porches, a foyer/open porch, and a detached one-car garage. The GBA is about 2,970 square feet (“SF”). Its frontage is about less than 30 feet from the railroad tracks (which tracks are not regularly used), and part of the house protrudes into the railroad’s right-of-way. The driveway leading to the garage is paved.
According to Silo’s expert, Mrs. Aliotta occupies only the second floor of the home, as the other floors are only “partially livable.” One of the three bathrooms is “completely unusable,” and the second of the three bathrooms had a non-operational shower. The expert testified that both kitchens have not been upgraded since their installation sometime in the 1960s. The dirt basement floods during heavy rain, and has a “sump pump” protruding approximately two feet out of the ground. The attic, which is used for *432 storage, is also unfinished and lacks insulation in the rafters. The photographs of the home show the living areas as being in a neat condition, the kitchens as being dated, and portions such as the ceiling, bathroom and basement as being in need of significant repairs/replaeement.
Silo leases sections of the land behind the dwelling (but fenced off from the dwelling). Such land is described as a “Contractor’s Yard.” Most of the Contractor’s Yard is gravel, however, some areas are paved. Portions of the Yard are leased to several tenants such as contractors and landscapers for parking their landscaping trucks/trailers or a dump truck, or for the storage of the tenants’ materials/equipment.
Each lease permits the tenant to utilize a certain space on the land to place their vehicles, construction trailers, or other improvements as desired, and some portion of the surrounding land. The lease agreements do not delineate the area of land being leased, but simply have rectangles in different areas of the Contractor’s Yard, with the names of the tenants written into the rectangle or space, including, at times, the nature of the trailers or the like. The lease rental is a flat amount for a month, and is not based on any form of defined unit (such as a per SF (“PSF”) basis of either the trailer or storage device, or a per-acre basis of land). The tenants are responsible solely for paying rent for the use of land. They do not pay for any other items, such as real property taxes or maintenance of common areas. However, they are responsible for directly paying the utility company any charges they incur for electric, heat, and water. Due to this, Silo’s expert considered the leases as “net.” Nonetheless, because Silo paid all the real property taxes, he deemed the leases gross for purposes of developing the capitalization rates for the Contractor’s Yard, by adding the tax rate to the capitalization rate.
The lease agreements require the tenants to remove any “equipment, fixtures, goods or other property” upon termination of the leases or upon their vacating the premises. Failure to remove these items would be deemed an abandonment of the same, and Silo, as landlord, could sell or dispose the items and retain *433 proceeds. The agreements also provide that if a tenant, with Silo’s consent, made, installed or attached any “alterations, additions or improvements” to the leased area, those would “belong to and become the property” of Silo and would revert to Silo upon termination or expiration of the lease.
It is undisputed that although the lease agreements between the tenants and Silo were for one month, they have been extended on a month-to-month basis for several years.
For purposes of these appeals, Belleville’s expert had initially included the White and Brown Trailers, the Quonset Hut, and a cell tower as part of the valuation of the Subject in his report.[3] It is undisputed that these structures belong to the tenants leasing areas of the Contractor’s Yard, and the Quonset Hut was erected by the tenant. As with other tenants, Silo is responsible for paying the property taxes imposed on the Subject, while utilities or other maintenance expenses are paid by the tenant-owners of the trailers and Quonset Hut.
The White Trailer measuring 672 SF is owned and used by the tenant Roman E & G construction company. The lease provided to the court was dated May 1, 2006, with a rental of $1,260 for one month. The usage of the Subject was restricted to “storage of construction equipment, construction materials and office trailer.” Schedule A to the lease is a sketch which shows four rectangles as the areas allocated to the tenant, one titled “Roman E & G Office Trailer,” one “Roman Trailer,” one “Roman E & G Shed,” and one “Roman E & G Storage Trailer.” There are no measurements of the areas leased to this tenant on the sketch or in the lease document. Per the rent rolls, the tenant paid $3,500 per month for 2008 through 2010.
The Brown Trailer measuring 600 SF is owned and used by the tenant Global Development. It has been on the Subject since at *434 least 2007. The court was provided with a lease commencing May 1, 2005, showing a rental of $750 for one month. Usage of the land was restricted to “storage of construction equipment, construction materials and office trailer.” Schedule A to the lease is a sketch which shows one rectangle as allocated to the tenant titled “Global Off,” the adjacent area (without any delineation) titled “Global” and another rectangle titled “Global.” Even though this lease predated the lease for Roman E & G, the sketch attached to the Global Development’s lease showed two rectangles depicting the space rented to “Roman E & G Storage” and “Roman E & G Office.”
Global Development also constructed the Quonset Hut which measures 38 feet by 60 feet (or 2,280 SF). A total of eight shipping containers form the walls of the hut (four on each side stacked upon each other). The Hut is used to repair, maintain, and store vehicles. According to Belleville’s expert, the fuel station between the Brown Trailer and the Quonset Hut measures about 40 SF. Global Development paid $1,000 per month in 2011. No rental information was provided by Silo for the intervening years 2006 to 2011.
The cell tower tenant paid a monthly rent of $2,713 in 2008, $2,857 in 2009, and $2,883 in 2010 and 2011. This item was included as taxable property and not disputed by Silo.
After this court ruled on Silo’s in limine motion holding that the Trailers and the Quonset Hut were taxable as real property, Belleville’s expert’s amended expert report included not only these three items as “improvements on the property” but also a description of a salt shed (built upon concrete blocks to store salt); a fuel storage area owned by Global Development which lay between the Brown Trailer and the Quonset Hut; a second garage; a storage area next to the garage; and the eight storage containers (which were the walls of the Quonset Hut). He placed a value on the last three of these items.
Silo’s expert’s report also contained pictures of the salt shed (which he called “Lean To” area); the second garage (measuring 558 SF and belonging to Silo, which he called the “Block Garage”); *435 the storage next to this garage (measuring 490 SF and belonging to a tenant); and an adjacent “container.” He placed a value only on the Block Garage.

(B) EXPERTS’ VALUATION

Both experts agreed that the Subject is unique because of its hybrid uses. Both also agreed that the Subject’s income production and income producing potential was predominant, and favored reliance upon the income approach. However their methodology differed.

(1) Silo’s Expert’s Value Conclusion

Silo’s expert utilized three approaches to the three components of the Subject. The first was a “blended” approach of both the sales comparison and income capitalization approach for valuing the land. The second was a cost approach to value the Trailers and Hut. The third was a summation approach for valuation of the house.

(i) Land!Contractor’s Yard,

The expert testified that he gave most weight to the income approach for his land value conclusion (80%) and only minimal weight to the sales comparison approach (20%) since a buyer would be more concerned with Subject’s income-producing potential. He acknowledged that such allocation was subjective, but based on his experience, felt the same was “a good split.”

Sales Comparison Approach

The expert chose five sales of commercial properties all located within Essex County, four of which were improved. He procured the information of the sales from the Multiple Listing Service (“MLS”). For each of his comparable, he applied the same adjustments for each of the four tax years at issue, which was for site size, GBA, and location. He did not feel it “would be beneficial in any way” to adjust for market changes.
Comparable One is improved by two large garages with steel, roll-up doors measuring 12,377 SF, and a small office area measur *436 ing 1,404 SF. Used mostly as a commercial storage lot, it is zoned B-G (general business), and borders Second River and the Conrail railroad tracks as does the Subject. A Class 4A property, it measures 2.85 acres in size (or 124,146 SF), with a GBA of 13,781 SF. The expert provided a +10% adjustment for its larger GBA than the Subject’s GBA of 3,124 SF.
Comparable Two, located at 259-265 Washington Avenue in Belleville, in zone R-B (two-family), is improved by a single-level store with a rear shed and parking lot. It is 0.22 acres in size (or 9,583 SF) with a GBA of 5,998 SF. The expert testified that the comparable had a superior location since Washington Avenue is a main thoroughfare. He made adjustments as follows: -10% for location, + 5% for GBA, and +15% for site size.
Comparable Three, located at 212-226 McClellan Street in Newark, is a large parking lot with approximately 400 spaces near Newark Liberty International Airport. It is 2.34 acres in size (or 101,930 SF), with zero SF of GBA, and is paved unlike the Subject. He made a +5% adjustment for GBA.
Comparable Four, located on a “dead-end” street at 40 Rev. Roberts Place in Nutley, is improved by a four-bay garage and a parking lot for commercial vehicles, located in Zone B2 (neighborhood business). It is 0.51 acres in size (or 22,215 SF), much smaller than the Subject, with a GBA of 1,098 SF. He made -5% adjustment for GBA and +15% adjustment for site size.
Comparable Five, located at 104-112 Lister Avenue in Newark is improved by eight warehouses, all of differing size, and a parking area. Located by Passaic River, it is a large, flat, open area used for light manufacturing, warehousing, and vehicle storage. It is 2.29 acres in size (or 99,752 SF), with a GBA of 43,924 SF. He made -20% adjustment for location and a +40% adjustment for GBA.
The following is the summary of the comparables:
*437 [[Image here]]
The expert used his calculator to perform a “linear” regression using the high, low and average adjusted sales amounts ($1,500,-270; $769,898, $1,135,084) and adjusted high, low, average PSF values ($80.34; $6.64; $43.49), as $940,416 or $10.53 PSF. He thus computed the Subject’s value as $10.53 PSF, for a total value of $954,060 ($10.53 x 90,604 SF or 2.08 acres), rounded to $950,000 for all tax years.

Income Approach

Silo’s expert then employed the income approach for the land. He first determined the potential gross income of the Subject using gross revenues reported on the Silo’s income tax returns, which totaled $145,936 in tax year 2008; $163,036 in tax year 2009; $187,993 in tax year 2010; and $206,288 in tax year 2011. Since there was no other miscellaneous income, he deemed the Subject’s effective gross income for each tax year as the gross income reported on the tax returns. He testified that the income included the cell tower income.
He further testified that while he normally used the annual income, here he averaged the Subject’s effective gross income amounts for the three tax years subsequent to tax year 2008 because “the town instructed [him] that they were going to use three-year net income,” and that he wanted to do the same. Thus, while he used income as of 10/1/2007 for tax year 2008, he averaged the reported income for 2008 and 2009 for tax year 2009; the reported income for 2008 to 2010 for tax year 2010; and the reported income for 2009 to 2011 for tax year 2011.[4] He stated that although income increased during 2007 to 2009, this was not inconsistent with declining home values which was a result of a declining residential market.
*438 The expert did not provide for a vacancy and collection loss. He opined that since the reported gross income would not have included delinquent rents, it was unnecessary to add the unpaid rents to the reported gross income and then adjust for a vacancy and collection loss.
His report for each year noted that the income/expense information provided by Silo was unverified. He testified that he had disallowed several expenses since they were not ordinarily considered as operating expenses under the acronym “TIMUR” (taxes, insurance, utilities, management and reserves). Thus, although the accountant had reported expenses of $85,064 for 2007, the expert only provided for $55,367. For 2008 and 2009, per the accountant the expenses were about $109,000 and $121,000, yet the expert used about $74,000 and $75,000 respectively. He stabilized reserves at 2%, and provided 5% as miscellaneous expenses.
He calculated the expenses as $55,367 for tax year 2008. For determining the 2009 expenses, he averaged the expenses of 2008 and 2009. For the 2010 expenses, he averaged the expenses for 2008 to 2010, and for the 2011 expenses, he averaged the 2009-2011 expenses.[5] His net operating income was:
[[Image here]]
*439 The expert next determined the capitalization rate under the band of investment method. He added the tax rate to the capitalization rate as Silo pays the real estate taxes. He testified that he called local banks in Belleville to inquire the prevailing lending rates since the Subject had several tenants. Two local banks reported a 65% loan to value ratio, thus, he used this as the loan amount for all tax years, which kept “it simple” and which left a 35% equity ratio. He used a 20-year mortgage amortization term, since banks would not provide a 20 or 30-year loan on land alone due to risks and sale impediments if the Subject was foreclosed upon (such as, the impact of the Highlands statute). He examined interest rates on residences (ranging from 4%-6%); commercial loans (4%-6%); and land loans (75£%) and opted for 7}£% as being reasonable. He chose 7% as the equity dividend rate after examining several investment rates and the national retail capitalization rates and the deemed the same to be a fair return for investment in the Subject.
He thus concluded the Subject’s overall capitalization rate, including the effective tax rate, as 10.92% for 2008; 10.88% for 2009; 11.18% for 2010; and 11.64% for 2011. Applying these rates to each tax year’s net operating income, he arrived at a value of $829,386 (2008); $832,564 (2009); $878,399 (2010)[9]; and $942,878 (2011). The expert took 80% of the value conclusions under the income approach, added them to the 20% concluded under the sales comparison approach, for a final “blended” value as follows:
[[Image here]]

*440
(ii) Improvements to Contractor’s Yard

The expert used the cost approach for the Trailers, the Quonset Hut, and the Block Garage. He ascribed no value to the storage shed adjacent to the garage owned by a tenant, or to the un-used “lean to” three-sided shed owed by Silo.
The expert testified that he used Marshall & Swift (“M & S”) to calculate the cost value of each improvement deemed to be affixed to the land as real property, in addition to reviewing the cost data in the Assessor’s Handbook. His report noted that he had also contacted a local company selling and renting mobile trailers. He testified that construction trailers are routinely bought or rented (in a new or used condition) with a bill of sale, and are disposed of either by their sale, relocation, or destruction (if too expensive to relocate).
“Storage Containers” generally measured 8 feet wide, 8)4 feet high, and 20 or 40 feet in length. Sale prices for new containers ranged between $l,000-$4,000 (20 feet long) or $1,400 to $5,800 (40 feet long), while used containers sold for about $2,000 (20 feet long) or $3,500 (40 feet long). Rentals of used containers (for a 1¡¿ to 2-year term) averaged about $800 to $3,500.
Using the M & S cost data, and deeming the quality of the Brown Trailer as “fair” and its condition as “average,” Silo’s expert arrived at its replacement cost as $30,394 (by including all components such as base cost, bathroom, roof, skirting, floor, heat/heat pump). He offset the same by 50% for physical and functional depreciation, and arrived at a final cost of $15,000 (rounded). He went through similar steps for estimating the replacement cost of the White Trailer (but deemed its condition as “Badly Worn/Average”) as $33,385. He used a 70% depreciation factor for a final cost of $10,000 (rounded). These amounts were used for all tax years. He based his condition analysis on his physical inspection of the trailers, although he only performed an exterior inspection of the White Trailer.
*441 The expert maintained that although the Assessor’s Handbook showed a base cost of about $30, he used a higher base cost from the M & S data. He also testified that although subjective, based on his extensive experience and personal knowledge of trailers, and trailer parks, which depreciate quickly after purchase, and because of the wear and tear, his selection of depreciation rates was reasonable. He agreed that he used the computer to calculate depreciation on the whole cost (as opposed to each itemized cost), and that he took the rates applicable to “manufactured housing” which is all the computer program contains. He explained that the 9% depreciation listed in the M & S data did not apply to the Quonset Hut because the rate applied to a trailer park does not depreciate like a mobile home and was not similar to the realistic condition of the Quonset Hut.
For tax years 2010 and 2011, the expert attributed a value of $24,000 to the Quonset Hut (which he called the “Repair & Storage Area,” measured at 2,280 SF) using the M & S cost data. Attributing a base cost to the area, plus cost for the eight containers (which constituted the walls of the Hut); roof; heat/hot air furnace, he concluded a replacement value of $60,439. To this he applied a 60% depreciation factor (physical and functional), for a total cost of $24,000 (rounded). He deemed the quality of the Hut as “fair” and its condition as “average” based upon his personal inspection (exterior and interior) of the same.
He testified that he chose a 60% depreciation rate because the corrugated roof had holes cut in them which rendered the Hut useless to a future buyer. He opined that it was senseless to compare the Quonset Hut to a warehouse because the Hut had no foundation, did not “fit the description of a building or structure,” and was used for repairs and maintenance whereas warehouses are predominantly and only used for storage purposes.
For all tax years, he valued the Brown Trailer at $15,000 and the White Trailer at $10,000. For tax years 2010 and 2011, he valued the Quonset Hut at $24,000.
For all tax years, the expert also included a value for the “Block Garage” measuring about 558 SF, which was owned by Silo, but *442 alleged as being used by a tenant. Adjacent to the Block Garage was another long-existent garage owned and used by a tenant for storage and measuring about 490 SF.[12] He attributed a value to the Block Garage, claiming it to be in “fair” condition, at $25 PSF or $14,000. There was no explanation of how the PSF amount was derived. He attributed zero value for all tax years to the adjacent storage garage because the garage was made of wood, not powered, located on dirt, and built by the tenant.

(in) Improvements to Subject (Residence)

The expert’s report and testimony considered the home “superfluous” because it did not contribute to the Subject’s highest and best use (income producing Contractor’s Yard). He further opined the house being almost a detriment as it sat on a predominantly industrial yard with no independent land value since it had no yard (front or rear), and was in close proximity to railroad tracks making is unsafe and undesirable for families.
He thus used an “abstraction” or “summation” approach to value the improvement portion of the residence. For this, he analyzed comparable sales, which he testified were similar to the Subject. He concluded that the “dwelling to sale price ratio” was about 35% to 40%. He testified that he applied the land-to-improvement allocation ratio of the assessment of the comparable to the unadjusted sales price of that comparable to determine the sales price attributable to the improvement portion of the comparable. He selected 35% as being reasonable since land was at a premium in Belleville. He maintained that the summation or extraction method of valuation was often used especially for single family residences and is credible because it is not speculative. The expert computed the price attributable to improvement of comparable single-family home sales, located in Belleville, close to the Subject, as follows:
Tax Years 2008/2009:
*443 [[Image here]]
Tax year 2010:
[[Image here]]
Tax year 2011:
Tax year 2011;
[[Image here]]
From these “improvement values,” the expert calculated that the average price for the residence portion of the Subject, for valuation purposes, and as rounded, would equal $125,000 for tax years 2008 and 2009; $117,000 for tax year 2010 and $122,000 for 2011. He testified that he input the dollar amounts into his calculator for these value conclusions.
*444 His final overall value of the Subject was thus:
[[Image here]]

(2) Bellville’s Expert’s Value Conclusion

Belleville’s expert used the income approach for all components of the Subject comprising the (1) Contractor’s Yard; (2) the house; (3) the White Trailer; (4) the Brown Trailer; (5) the Quonset Hut; (6) the storage containers (the “walls” of the Quonset Hut); (7) the independent second garage; and, (8) the storage shed adjacent to the independent second garage. He used comparable rentals for each of the above components, took the potential income generated from the property as a whole, and applied a capitalization rate to determine the Subject’s overall value. The expert stated that treating each aspect of the Subject as income-producing was the most effective and accurate method because “it is an income-producing land, and its major attraction to any investor is how many tenants are there and what income is produced on the land.” He also noted that the “tenant’s constructions” did not “count” for purposes of applying a cost approach.

(i) Contractor’s Yard

Belleville’s expert determined the income potential of the Contractor’s Yard based on the rent rolls (except for 2007 which were not provided to him) and Income & Expense Statements provided to him by Silo.
He did not average the income because “according to the Real Estate Handbook from Appraisal Institute, [he] can only use one year’s income for [direct] capitalization.” He noted that using *445 multiple year income would require application of the discounted cash flow analysis, not normally accepted for local property tax appeals.
For tax year 2008 he used the rents shown on the Income & Expense Statement of $145,936, as that year’s potential gross income (the same as Silo’s expert). For tax year 2009, he used $174,401 as the gross rental income based upon the December 31, 2008 rent roll of $14,533 per month, and annualized it for an amount of $174,401.[20] For 2010, the December 31, 2009 rent roll showed a total monthly rent of $14,951.65 but the correct total was $16,477. The expert annualized this correct amount and used $197,720 as the gross rent. For 2011, he annualized the reported 2010 monthly rent roll of $16,778 and arrived at the gross rental income of $201,336.
The rents rolls for any tax year did not report rent for Global Development, the tenant owning the Brown Trailer, and, from 2009 onwards, the Quonset Hut. However, the expert’s report in the 2008 rent rolls (used for 2009 tax year), noted that Global Development paid “Jan, Feb, Mar. $2,000 per month.” The rent rolls for 2008 to 2010 reflected a monthly rental of $3,500 paid by the tenant Roman E & G, which owned the White Trailer.
The expert provided a 2% vacancy rate on grounds it was difficult to find properties akin to the Subject. He next provided for expenses. They included the average of some categories of expenses of the prior three years as reported on the Ineome/Expense Statement, and stabilized expenses for Management (3%); Reserves (3%); Repairs/Maintenance (3%); and Miscellaneous (1%). He also provided for utility expenses (for the residence) by using numbers from the HUD data, and for use of the “lighted” pole. He arrived at a net operating income as follows:[21]
*446 [[Image here]]
The expert used a 70% mortgage ratio (at 6.85% interest rate and 30-year period with a 10-year balloon payment), and a 30% equity ratio (at 6% return rate since industrial spaces were at a premium in the township) for a capitalization rate of 7.3% (2008); (2009); (2010); and (2011). To this he added the effective tax rates for an overall capitalization rate of 9.67% (2008); 9.29% (2009); 9.44% (2010); and 9.94% (2011). Applying these rates to each tax year’s net operating income, he arrived at a value of $1.6 million (2008); $1.92 million (2009); $2.35 million (2010 and 2011).

(ii) Improvements to Contractor’s Yard

Belleville’s expert used 2,280 SF for the Quonset Hut but labeled it as the “vehicle repair area,” and deemed 1,980 SF as the area occupied by the eight storage containers (thus, the total “ground area” covered by the Hut was 3,240 SF). His measurements of the two Trailers were the same as Silo’s expert.
He first estimated the potential rent for the Trailers by contact ing trailer leasing companies in and out of State for information in this regard. They provided a range of $285 to $500 per month for a 12x56 SF heated, air-conditioned office trailer leased for over one year. The expert’s report noted that such rents tend to remain constant over the lease period, especially if the trailers remain on-site for more than a year. He therefore concluded a rental estimate of $375 per month for both Trailers for all tax years.
The expert deemed the Quonset Hut functionally similar to a warehouse since it is located in an industrial area and usable for storage. He used two rental comparables in the Township, both located on 15 Willet Street, owned by the same landlord, which did not provide any amenities (thus net leases). One warehouse had a leased area of 5,700 SF for a three-year period (beginning 11/1/07). Used for general warehousing of storage containers, it was rented *447 for $3,681.25/month in 2007; $3,838.50/month in 2008; and $3,981.67/month in 2009, equating to a PSF rent of $7.75; $8.06; and $8.38 for each year respectively. The second comparable had a leased area of 6,500 SF for a 4-year period (beginning 11/1/07) at rents of $3,522.83/month in 2007; $3,622.83/month in 2008; and $3,772.83/month in 2009, which equated to a PSF rent of $6.50; $6.69; and $6.97 for each year, respectively. It was used for warehousing and distribution for a ceramic tile manufacturer. The expert provide a +20% adjustment since the Quonset Hut was smaller sized and “landlords charge more rent for leasing smaller spaces.” He provided an adjustment of -15% for the comparables’ better visibility since the Hut was in an isolated location. Finally, he provided a +20% adjustment for the comparables’ rent because the Hut was newer (two years old as of the assessment dates), and “tenants pay more for newer space.”
The 2009-2010 rentals PSF with the above adjustments provided an adjusted rent of $10.48 PSF and $8.71 PSF respectively. H concluded a potential rent for the Hut at $9.50 PSF.
He also estimated potential rent for the space contained in the eight storage containers which formed the walls of the Quonset Hut because that space was used to store materials and was accessed by a wheeled staircase. Using the same lease comparables (15 Willet Street); the same rental amount for 2009-2010; the same size and location adjustments; but including a -30% adjustment for access; the expert arrived at an adjusted rent of $6.29 PSF and $5.23 PSF respectively, and concluded an estimated rent for the containers at $5.50 PSF.
Further, he estimated the potential rent for the Block Garage (which he called the second “car storage garage”) by comparing it to large garage in Orange (about 1,000 SF) which had an asking rent of $900 a month or $10.50 PSF in 2012 (plus $75 per month per parking space). The expert made the following upward adjustments: 10% each for the Township’s economic superiority and the garage’s locational superiority. He made negative adjustments for age (20%); the rent was “asking rent” (10%); and the asking rent was in 2012 whereas the expert was estimating a *448 potential rent for earlier tax years (at 3% per year, thus -16% for 2008; -13% for 2009; -10% for 2010 and -7% for 2011). He arrived at an adjusted rent of $8.70 PSF.
For the storage area attached to this garage, he estimated the rent at 50% of this amount or $4.35 PSP (as compared to Silo’s expert who attributed no value to this fixture).
In sum, he concluded the following estimates of rental income: (1) $375 per month for the Brown Trailer; (2) $375 per month for the White Trailer; (3) $9.50 PSF for the Quonset Hut; (4) $5.50 PSF for the area occupied by the eight storage containers; (5) $8.70 PSF for the Block Garage; and (6) $4.35 PSF for the Storage Area adjacent to the second garage.

(in) Improvements to the Subject (Residence)

Belleville’s expert used the MLS to find comparable rental properties for each tax year. For each tax year’s estimation of potential rent, he noted that the Subject was larger than the comparables and was located on a quiet street close to a main thoroughfare. The following is a summary of the comparables for each tax year:
Tax Year 2008:
[[Image here]]
Tax year 2009:
[[Image here]]
Tax Year 2010:
*449 [[Image here]]
Tax Year 2011:
[[Image here]]
Based on the above comparable rentals, Belleville’s expert concluded the potential rent from the residence on the Subject as $l,950/month (2008); $l,975/month (2009); $2,000/month (2010); and $2,100/month (2011).
His value conclusion for the Subject for each year was: $1,600,000 (2008); $1,920,000 (2009); $2,350,000 (2010 and 2011).

FINDINGS

“There is no one doctrinaire approach to the valuation of property____ The search is for the true value of the property; that price which a hypothetical buyer would pay a hypothetical willing seller.” Petrizzo v. Borough of Edgewater, 2 N.J.Tax 197, 200 (Tax 1981). “[T]he answer as to which approach should predominate depends upon the facts in the particular ease.” WCI-Westinghouse, Inc. v. Township of Edison, 7 N.J.Tax 610, 619 (Tax 1985), aff'd, 9 N.J.Tax 86 (App.Div.1986). What is important is “the price reasonably expected to be obtained for the subject property through the actions of the marketplace.” Ibid.
However, this does not mean that only one valuation approach must be used to value a subject property. Thus, courts can consider “cost less depreciation and sales of comparable property. It may also [consider] rental income.... There can be no rigid rule. The answer depends upon the particular facts and *450 the reaction to them of experts steeped in the history and hopes of the area.” City of New Brunswick v. N.J. Div. of Tax Appeals, 39 N.J. 537, 543-44, 189 A.2d 702 (1963). See also Livingston Mall Corp. v. Township of Livingston, 15 N.J.Tax 505 (Tax 1996) (agreeing with expert’s “hybrid approach” which comprised of the cost approach for the anchor stores and income approach for the remaining stores/tenant improvements). Thus, Silo’s expert’s hybrid approach is not per se inappropriate.
Belleville’s expert’s reliance on the income approach for all components of the Subject is also not per se improper. While it is true that the Trailers/Quonset Hut are tenant owned, they can nonetheless be considered for valuation under the income as tenant improvements to real property.[22] See e.g. Wayne Mall, Inc. v. Township of Wayne, 2 N.J.Tax 1, 18-19 (Tax 1980) (parties could properly have considered the “actual income realized” by a ear wash “owned by a tenant ... and ... located on land leased from” plaintiff landlord, under a straight economic approach instead of valuing the car wash under the cost approach for the car wash, and adding it to the income approach, which included the income from the land lease).
In the end, the “correct valuation approach depends on the ‘known data and the common sense of the situation.’ ” Brockway Glass Co. v. Township of Freehold, 10 N.J.Tax 356, 373 (Tax 1989) (quoting City of New Brunswick, supra, 39 N.J. at 551, 189 A.2d 702), aff'd, 12 N.J.Tax 263 (App.Div.1991), remanded on other grounds, 130 N.J. 3, 611 A.2d 643 (1992). In this connection, “the evidential value and weight to be given to the testimony of conflicting experts ... depends upon their candor, intelligence, knowledge, experience and especially upon the facts and reasoning which are offered as the foundation of their respective opinions.” Coastal Eagle Point Oil Co. v. Township of W. Deptford, 13 N.J.Tax 242, 299-300 (1993), aff'd, 15 N.J.Tax 190 (App.Div.), *451 certif. denied, 143 N.J. 320, 670 A.2d 1061 (1995). An expert’s opinion may be adopted in whole or in part or completely rejected. County of Middlesex v. Clearwater Village, Inc., 163 N.J.Super. 166, 174, 394 A.2d 390 (App.Div.1978), certif. denied, 79 N.J. 483, 401 A.2d 239 (1979). The court must apply its own judgment to valuation data submitted by the experts to determine the true value of the property provided it is based on the evidence before it. Glenpointe Assocs. v. Township ofTeaneck, 241 N.J.Super. 37, 46, 574 A.2d 459 (App.Div.), certif. denied, 122 N.J. 391, 585 A.2d 392 (1990).
Here, the court has to first analyze the Subject’s highest and best use, which, in turn, will determine the most persuasive valuation approach.

(A) HIGHEST AND BEST USE

Silo’s expert concluded that the Subject’s highest and best use as vacant, and as improved, is its current use. However, he testified that since the house has no land, almost all the attached land being used as a Contractor’s Yard, the house was superfluous and if demolished, would generate the maximum income for the Subject as additional land for use as a contractor’s yard. He testified that while land has intrinsic value, an improvement only adds to the land value if the improvement itself has value, which here the house did not. He opined that the Subject’s optimal use was as a Contractor’s Yard since there was a great demand for storage, and one could not erect a factory or an apartment on the Subject. Given his testimony, it appears that he believed the Subject’s highest and best use was its current use as a Contractor’s Yard only, as opposed to its dual current use of Contractor’s Yard as improved by a residence. Nonetheless, he attributed a value to the house (improvement only) at $125,000 for 2008 and 2009, $117,000 for 2010 and $122,000 for 2011.
With regard to zoning (the legally permissible aspect of the analysis), Silo’s expert’s report noted the Subject to be in the industrial zone, I-B. Zone I-B’s permitted principles uses include warehouses, building supply, construction business, vehicle body *452 shop, vehicle l’epair and vehicle service station, among others. The report did not address whether the house was a legally nonconforming use in this regard. However, the expert testified on direct that the Subject was primarily in the industrial zone, and the residence was in the R-B residential zone (which allows for construction and use of two-family homes).
Belleville’s expert stated in his report that the Subject’s highest and best use as vacant, and as improved, is for use as an industrial site. He testified that due to the large acreage, it was physically possible to park and store trucks or trailers, which also provided the maximal financial benefit, thus was financially feasible, and legally permissible since the Subject was located in an industrial zone. He stated that a major attraction to a potential buyer was the Subject’s ability to attract tenants and thus, earn income, which was a realistic factor given the large size of the area comprising the Contractor’s Yard. However, he also concluded that the residential use of the portion on which the home is situated met the four tests of highest and best use because of its continued existence and its potential to be rented. The report noted that “in the residential zone” the “proposed use” is “reasonably and physically possible because it pertains to an existing residential structure on the property.” The report also noted that the Subject was located in both zoning districts, with the industrial use being conforming and the residential use being non-conforming.[23] Yet he concluded, and testified, that the Subject’s highest and best use was “as an industrial site.”
Upon cross-examination Belleville’s expert testified that the residential use was legally permissible and conforming based upon his reading of the zoning requirements. However, he testified that per the new zoning map, which was in effect for the tax years at issue, the entire Subject was located in an industrial zone, that *453 his report had incorrectly listed the Subject as being in two zones, and that his report should have changed the two zoning districts to one.
The property record card in evidence noted the zone as “RB” only. There was no mention of the I-B zoning district. Belle-ville’s expert testified that the card’s notation of the zoning district was erroneous.
The list of permitted uses for each zoning district (reproduced in the experts’ reports) does not appear to permit a residential use in the industrial zone or vice-versa. Belleville’s zoning code, Chap. XXIII, Sec. 23-7 notes that “[i]n any district, any use which is not classified as permitted shall be considered a prohibited use.”
Given the facts on the record, and because the counsel for both parties jointly agreed that the Subject is in the industrial zone for the tax years at issue, the court finds that the highest and best use of the Subject, as vacant, and as improved, is its current use in the industrial zone. Both experts were uniform in their opinion that the Subject’s highest and best use was for industrial only, ie., for parking and storage of construction or other commercial trailers.
This raises the issue of whether the house, as an improvement, adds any value to the overall highest and best use of the Subject or its value should be negated. Silo’s expert’s opinion that the house was superfluous and detrimental to the Subject’s maximal productivity appears to so indicate. However, he did not value the Subject as vacant land. He did not include any analysis of demolition costs in concluding that the land was more valuable without the house on it. Nor was there any analysis whether the house was, at best, an interim use. Cf. City of Atlantic City v. Boardwalk Regency Corp., 19 N.J.Tax 164 (App.Div.2000) (taxpayer’s expert analyzed and valued one of the nine lots as having at best an interim use as a parking lot until future casino development); Appel v. City of Englewood, 15 N.J.Tax 537 (Tax 1996) (agreeing with expert’s “reliable” opinion that the subject property should be valued as vacant land for development which was greater than its value as currently improved). Belleville’s expert similarly did not value the Subject as vacant land nor use vacant *454 land as comparables. Indeed, both experts provided a value to the residence portion.
The residence appears to be a non-conforming use in an industrial zone when the dual zones were changed to a single industrial zone for the tax years at issue (since the house has been in place for more than 50 years). No facts or other information was provided to this court to the contrary, or whether the use was a legally permitted non-conforming use.[24] The house was in a livable condition, was used and occupied as a residence for the tax years in question. Thus, it appears to have value in its use as such. Therefore, the court finds that the highest and best use of the Subject as vacant, and as improved, is its current use, namely, as a Contractor’s Yard (as improved), with the residence.

(B) VALUATION ANALYSIS

The court finds that Silo’s expert’s sales comparison approach for the land area of the Subject is not credible. The expert agreed that since he was opining the value of the land only, and that the residence had no contributory value to the Subject’s “overall value or business,” he should not have provided adjustments to the sale prices for GBA differentials, the GBA being based upon the living area of the residence alone. Although he maintained that this was a harmless error since the range of adjustments was 5% to 10%, he omitted to consider the +40% adjustment he had made to Comparable 5 for GBA.
Additionally, the comparables were located in differing zones which would not permit the Subject’s use. Their GBA of the comparables differed from the information on the respective property record cards. None of the sales were verified to confirm they were arms-length transactions. Indeed, Comparable 3, the closest to the Subject as an income-producing parking lot, evidenced that *455 only partial interests were sold. The expert also agreed that Comparable 5 (Lister Avenue) was not competitive with the Subject, and he did not know about its 2008 sale.
The expert also testified that valuation of income producing property under the sales comparison approach has generally little weight because two identical properties can have significantly differing income and a buyer could pay more for the higher income producing property even if it is physically similar to the other lower income producing property. His report also emphasized that he place “minimal weight” to the market approach.
For all of these reasons, the sales comparison approach used by Silo’s expert does not provide a reliable indicator of value of the Contractor’s Yard portion of the Subject, even if the expert used only 20% of the same towards the overall value conclusion of this component. In this connection, the concluded amount is incorrect since it is based upon the land size of 2.08 acres, rather than the more accurate 2.69 acres. In any event, since the value conclusion included the residence, using 20% of the same as the land value only is questionable.
The rejection of the sales comparison approach for valuation of the land leaves remaining the viability of the income approach. It should be noted that since Silo’s expert relied only upon the rental income produced by the Contractor’s Yard[25] (as opposed to finding a PSF rental value for the entire Subject), and it being undisputed that the land upon which the residence is located is not leased, the expert’s income approach provides a value only for the Contractor’s Yard (which is the land area adjacent to and behind the residence). His summation or extraction approach for the residence similarly does not include a value for any of the land area upon which the residence is located (or the area used for the driveway leading to the residential garage or the front yard).
*456 In the income approach for the Contractor’s Yard, the court initially notes that neither expert examined whether the rent rolls or income reported on the tax returns, reflected market rents. The leases provided to the court dated back to 2005 or 2006. The leases do not provide a clear indication of the basis for the rent, i.e., whether it is based upon the area of land occupied by the tenant fixtures (deemed to be real estate by this court), or some other means. They do not delineate the size of the tenant-owned fixtures and the addenda to the leases simply indicate sketches of the area to be occupied by the tenants. It is difficult to reconcile a rent paid by the tenant of the White Trailer which occupied 672 SF ($1,260 per month in 2006 or $22.50 PSF; then $3,500 per month from 2008 onwards or $62.50 PSF), with the rent paid by Global Development in 2005 of $750 per month for the Brown Trailer which occupied 600 SF (or $15 PSF), and then $1,000 per month in 2011 for an area over 3,000 SF (or $3.09 PSF) without knowing how much area was leased to either tenant. Whereas, another tenant which owned and operated a cell tower, leased 2,500 SF for $2,700 to $2,800 per month or about $13 PSF. Nonetheless, because the experts appear to have deemed the rents as market, the court will accept the same. Additionally, because the only evidence before the court on the rent paid by Global Development is $750 in 2005, and then $2,000 in 2008 (mentioned, but not included in the rent roll), and $1,000 in 2011 (stated in the rent roll), the court will use $2,000 per month for this tenant, this amount being closest to the tax years at issue here.
The court does not find persuasive Silo’s expert’s averaging of the three prior year income because he provided no supportable basis for the same, either under law or under sound appraisal principles. See also Rodwood Gardens, Inc. v. City of Summit, 188 N.J.Super. 34, 40-42, 455 A.2d 1136 (App.Div.1982) (rejecting the expert’s averaging of a property’s actual, annual four-year income figures to determine future net operating income under the income approach). Belleville’s expert’s use of income reported on the rent rolls is more credible. However, he admitted that certain rents on the 2008 rent roll (used for tax year 2009) should not have been annualized (a $200 per month tenant who *457 “left” May 31, 2008, owing $600, two rents which commenced only September 15, 2008 and October 1, 2008). Therefore, the court will re-compute the rent in this regard.
Silo’s expert’s assumption that any vacancy allowance is unnecessary is unpersuasive. Additionally, while his report contained some vacancy rate data for tax years 2010 and 2011, (which was illegible in several portions), the data did not discuss either the Subject’s locality; addressed retail shopping centers; and then predicted 1% rise in vacancy for 2011 in northern New Jersey. The court therefore accepts the 2% rate posited by Belleville’s expert.
Given the undisputed facts that Silo is leasing land; the photographs show that most of the Contractor’s Yard is unpaved; the tenants bear all expenses except taxes; and land used for industrial purposes is at a premium in Belleville, the court finds reasonable a stabilized amount of 1% for reserves; 1% for repairs/maintenance; 2% for management; and 2% for miscellaneous expenses. Silo’s expert’s provision for insurance is more accurate than Belleville’s expert who did not carry forward the correct numbers for the prior years, thus, his average amounts are incorrect. Last, the utility expenses as averaged by Silo’s expert is more persuasive because Belleville’s expert used the HUD tenant information which applies to residential tenants only, thus, his allowance applies only to the residential portion of the Subject, and further his allowance of $400 per year for the lighting in the Contractor’s Yard is too conservative given the large area of the yard.
Finally, the court finds Belleville’s development of capitalization rates more persuasive. The Subject is being valued as land only, and given the undisputed facts that this is considered a premium investment in Belleville, the court does not find credible Silo’s expert’s opinion that the land was less valuable because of speculative impediments such as foreclosure or application of the Highlands Act, meriting a higher capitalization rate.
*458 As to the improvements on the Contractor’s Yard, the court finds more persuasive Silo’s expert’s cost approach (except for the Block Garage) because the income approach fails to factor in the impact of the cost of the tenant improvements made by the tenant for the Quonset Hut. Belleville’s expert reasonably explained that since the tenants were only paying rents for the ground lease, and because the court ruled the fixtures be taxable as real estate improvements, he had to impute income to the improvements (the Contractor’s Yard being undisputedly an income producing property). It is also true that tenant improvements can enhance the overall income producing capacity of the property. See e.g. Lawrence Assocs. v. Township of Lawrence, 5 N.J.Tax 481, 553-554 (Tax 1983) (“[i]t simply cannot be ignored that the improvements made by the Mall tenants created finished space that was more valuable income property than was the series of concrete shells Silo leased to its tenants” and it is irrelevant that “tenant finishes of one tenant” may be of “no value to a succeeding tenant” because the tenant “finishes added value to the Mall structure and that value must be recognized in the income approach”). However, it is also recognized that when market rents are used to develop the potential gross income, and a comparison is made to rental income from non-ground leases, an adjustment is usually made for tenant-built improvements. See generally Nat’l Westminster Bank New Jersey v. City of Brigantine, 11 N.J.Tax 502, 509-511 (Tax 1991) (“[e]xtensive tenant improvements can influence lease rent____ If capital expenditures are made by the tenant, the lessor may lower the tenant’s rent below market levels for all or part of the lease term” thus, without information of the costs for tenant improvements “it is impossible to determine if the tenant improvement factor of the economic rent used by the witness is correct”).
Belleville’s expert agreed with this principle. Yet his market rental computation did not factor the cost or impact of the tenant-built Quonset Hut. Thus, his computation of the gross potential income for the Quonset Hut is not persuasive. See also ITT Continental Baking Co. v. Township of East Brunswick, 1 N.J.Tax 244, 252 (Tax 1980) (“cost approach” better suited when *459 “proofs adduced” are “more reliable,” and also preferred when there are “difficulties in comparing industrial with warehouse space in the income approach” which would “require speculation as to comparable rentals” and thus “lose[s its] charm and beckon to an alternative valuation technique”).
The problem as to the White Trailer is that in imputing income to this improvement, the expert failed to consider the fact that he had also included income received by the tenant-owner (Roman E & G) in his income analysis. Even if he were to have considered that income, the confusion is that the rental from the tenant is not just for the area used by the White Trailer but for other areas also. The 2005 lease for Global Development showed that Roman E & G was renting two areas (depicted by two rectangles), whereas the 2006 lease agreement with Roman E & G shows that the tenant was paying $1,260 for one month for four areas (depicted by four rectangles), three of which were for trailers. While the rent rolls showed that Roman E & G paid $3,500 per month for 2008 through 2010, the court has no information as to how many areas this rental covered. Therefore, the court finds that it has no information for the allocation of the rent paid by the tenant vis-a-vis the White Trailer. Since this could implicate a doubling of income (even if to some extent), the court finds the income approach for the White Trailer problematic.
It should be noted that Belleville’s expert did not include any income for Global Development in his income approach because the rent rolls for the tax years at issue did not include this information. Therefore, the duplicating (or some portion) of the income to this tenant is not present as was for Roman E & G. Nonetheless, the court finds the cost approach more persuasive because the Brown Trailer, by its general nature, and here, as used by the tenant, does not generate income per se.
Given Silo’s expert’s experience and expertise in the area of valuation of mobile trailers, residential or commercial, and his training and teaching qualifications in using the M & S data in applying the cost approach, the court accepts his value conclusions for the Trailers and the Quonset Hut.
*460 As noted above, both experts also considered two additional items as improvements to the Contractor’s Yard, namely, a Block Garage (or the second car garage) and a storage area beside this garage. The court finds more persuasive Belleville’s expert’s conclusion of the income potential for the Block Garage. It is owned by Silo, used by a tenant, and has none of the issues raised in connection with the Trailers and Quonset Hut (income duplication or tenant improvement factor). Silo’s expert’s cost conclusion is void of any reasoning, market driven or cost data.
Conversely, Belleville’s expert’s potential income for the storage area as 50% of the income potential for the Block Garage is unsubstantiated. Additionally, it is undisputed that the area is not powered and has a dirt foundation whereas the comparable did not suffer these factors. Moreover, the 2006 lease agreement with Roman E & G shows that the storage area next to the Block Garage was allocated to this tenant. Thus, the same issues of income duplication as was present for the White Trailer is present for the Storage area. Consequently, and due to lack of any credible evidence of the market value of this item, the court will accept Silo’s expert’s opinion that this improvement merited no value.
The valuation of the residence is problematic. Silo’s expert’s extraction/summation method assumes that the land under and adjacent to the residence is valueless, and that all of the land on the Subject is essentially comprised of the Contractor’s Yard. However, he did not explain how this assumption comports with the zoning laws which (a) require minimum setbacks for residences; and (b) require the setbacks remain open space not to be used for storage, drying clothes or parking (see Chap 23, See. 23-7.3(d) of Belleville’s zoning Code).
Second, even if it is presumed that the land upon which the house stands is subsumed in the Contractor’s Yard for valuation purposes involved in this litigation, there is no reliable evidence from the expert as to the value of this portion of the land. As noted above, his sales comparison approach which valued the entire Subject (even if claimed to be valuing only land) was not *461 given any weight, and his income approach for valuing the land used only contract rents however, the land occupied by the residence was not being leased by any tenant. This means that the court cannot consider Silo’s expert’s summation approach since the final value conclusion would be of something less than the fee simple interest.
Third, the expert’s 35% allocation was based upon the allocation of land-to-building in the comparable’s assessment. An allocation of value for assessment purposes is an “administrative process” and not necessarily reflective of the “correct apportionment of true value” of the property being assessed. Berkeley Development Co. v. Township of Berkeley Heights, 2 N.J.Tax 438, 449 (Tax 1981). Although an allocation ratio can be “meaningful[ly] support[ted]” from sources such as “mass appraisals prepared by assessors,” nonetheless, they can be “difficult to use in markets where the highest and best use and land value ratios of the comparable sales are not similar to the subject.” Appraisal Institute, The Appraisal of Real Estate, 367-68 (13th ed. 2008). There was no evidence that any of the comparables had the same highest and best use of the Subject. Additionally, there were several mathematical mistakes as to the 35% allocated amount of the sales price to the comparable, which in turn, impacted the expert’s conclusion of the average price for the Subject’s residence for each tax year.
Generally, if there is no credible evidence of the value of the improvement, the court cannot arrive at a total value for the Subject. See e.g. Lorenc v. Township of Bernards, 5 N.J.Tax 39, 51 (Tax 1982) (noting that the expert’s value conclusion omitted to “ascribe[ ]” a value to the “subject’s remainder,” and the while the court could ascertain a value per acre for a portion of the land based on the evidence presented, it did not have supportable adjustments for the comparable sales, thus, rendering the court unable to “conclude a total value” for the property). However, the court is also cognizant of its responsibility to find a true value for the property in question using its knowledge and expertise, when there is “sufficient substantial and competent evidence in the *462 record to support that determination.” Greenblatt v. City of Englewood, 26 N.J.Tax 41, 56 (Tax 2011).
Here, if the court were to consider Silo’s expert’s comparable sales without any allocation (thus ensuring that the entire Subject is afforded a value), it does not have any data to assess the comparability other than the expert’s testimony that they were all similar to the Subject. There are no photographs of the comparables. There is no data such as site size, gross living area size, garage count or other features. There was no confirmation of the usability of the comparable sales since the expert relied solely upon the MLS data.
Although Belleville’s expert also used only the MLS data to choose his rental comparables, his evidence fares better because his report contained a detailed description of the size, features, and amenities of the comparable. Further, the rental (considering only the comparables which were houses) covered land and improvement.
In this connection, the court is not convinced with Silo’s expert’s opinion that estimating a potential income for the residence as Belleville’s expert did, is improper because no one will rent the house which has a life estate (ie., someone living in it). The attempt here is to find the value of the house. While a life estate interest may impact the amount of imputed rent (or even the sales price under a sales comparison approach), and thus, justify an appropriate adjustment, the existence of that interest, in and of itself, does not prohibit application of a valuation approach. If this were not so, then Silo’s expert cannot justify his value conclusion for the house because under his reasoning a life estate would also prevent the house from being sold (since no buyer would want to buy the house with someone living in it).[26]
The court can therefore use Belleville’s data but only as to the comparables of rented houses. For each year these comparables were:
*463 Tax Year 2008:
[[Image here]]
Tax year 2009:
[[Image here]]
Tax Year 2010:
[[Image here]]
Tax Year 2011:
[[Image here]]
Based on the above comparable rentals, all of which were executed in reasonable proximity to the assessing dates, the economic rent can be derived from the rentals. The court finds a rent of $2,000 a month for all tax years except for tax year 2009 which is $1,700, is reasonable as the potential income from the residence.
The court finds sufficient evidence in the record to justify adjustments for the Subject’s inferior condition and location since the comparables were recently renovated and offered updated amenities and features. Belleville’s expert who testified that the house was in an average condition overall, also conceded that it would not be considered as being in premier shape as were some of his comparables. Indeed, the photographs of the residence evidence the undesirable physical conditions of the bathroom, *464 ceiling and basement. He also agreed that people do not “like big tracks in their front yards” or in their neighbor’s driveways, and conceded that the Subject’s ingress and egress were used by big commercial tracks/vehicles. Although he maintained that the railroad tracks were not often used, and the vehicular traffic was during non-business hours, there is no question that the tracks are about 30 feet away from the house, and part of the land on which the house sits, protrudes into the railroad’s right-of-way. Thus, it is not unreasonable to conclude that these features deter the Subject’s attractiveness when competing with other residences in the neighborhood, since they would be viewed as unsafe and undesirable to a potential buyer family, especially a family with children or elders.
The court finds that a negative 25% adjustment is warranted (- 10% for condition; -15% for location). It is generally true that the court will not provide for quantified adjustments without adequate market driven data. However, here, the evidence of the negative features allows this court to exercise its expertise in providing a reasonable adjustment. See Township of Warren v. Suffness, 225 N.J.Super. 399, 414-415, 542 A.2d 931 (App.Div.) (rejecting the argument that the Tax Court’s voluntary allowance of a 25% deduction for the property’s proximity to a quarry blasting operation which caused noise, dust and cracks required a reversal of its value conclusion because the court “had the right to apply [its] own judgment in making an independent assessment of the true values” and the adjustment for was “so clearly logical and reasonable” that is was “sustainable” even “in the absence of expert evidence to support such a deduction”), certif. denied, 113 N.J. 640, 552 A.2d 166 (1988).
Thus, the potential rent from the residence portion of the house is $1,500 per month for all tax years except for tax year 2009 which is $1,275 per month.

CONCLUSION

In sum, a hybrid approach is suited for the Subject. The income approach is the most appropriate for the Contractor’s Yard. The improvements in the Contractor’s Yard, namely, the *465 Quonset Hut and the Trailers, are more appropriately valued under the cost approach. However, based on the credible evidence before the court, the Block Garage requires to be valued under the income approach. The residence could have been valued either under the sales comparison approach or the income approach, however, the proofs adduced allow for use of the income approach with adjustments for condition and location.
The foregoing analysis can be summarized as follows for each tax year:

Tax Year 2008

Potential Gross Income
Rental Income for Contractor’s Yard $ 169,93627
Rental Income for Second Garage $ 4,340
Income from Residence $ 18,000
Total S 192,276
Less:
Vacancy & Collection Loss (2%) S (3,846)
Effective GrobS Income (“EGI”) S 188,430
Ix'SS-
Operating Expenses (6%) + insurance $4,214 - utilities $7,763) S( 23,283)
Net Operating Income S 165,147
OAR at 9.67%
Value $1,707,828
Rounded to $ 1,707,830
ADD. Value of Improvements on Contractor’s Yard S 25,000*
TOTAL: S 1,732,830
The assessed-to-true value ratio is 109.98% ($1,905,800/$1,732,830). Therefore, application of the average ratio (94.4%) is required, which reduces the assessment to $1,635,792 or $1,635,800 (rounded).
Tax Year 2009
*466 Potential Gross Income
Rental Income for Contractor’s Yard S 185,370»
Rental Income for Second Garage S 4,536
Income from Residence S 15,300
Total S 205,206
Less:
Vacancy & Collection Loss (2%) S (4,104)
Effective Gross Income (“EG1”) S 201,102
Less:
Operating Expenses (total 6% + insurance 54,057 + utilities $12,783) S( 28,906)
Net Operating Income 5 172,196
OAR at 9.29%
Value $1,853,563
Rounded to $1,853,560
ADD: Value of Improvements on Contractor’s Yard $ 25,000”
TOTAL: $ 1,878,560
The assessed-to-true value ratio is 101.45% ($1,905,800/$1,878,560). Therefore, application of the average ratio (92.38%) is required, which reduces the assessment to $1,735,414 or $1,735,400 (rounded).

Tax Year 2010

*467 Potential Gross Income
Rental Income for Contractor’s Yard S 221,72431
Rental Income for Second Garage S 4,704
Income from Residence S 18,000
Total S 244,428
Less.
Vacancy & Collection Loss (2%) S (4,889)
Effective Gross Income (“EGI”) S 239,539
Less-
Operating Expenses (total 6% + insurance $3,977 -utilities $15,172) S (33,521)
Net Operating Income $206,018
OAR at 9,44% Value $2,182,394
Rounded to $2,182,395
ADD. Value of Improvements on Contractor’s Yard S 49,00032
TOTAL $2,231,395
The assessed-to-true value ratio is 85.41% ($1,905,800/$2,231,395). This is within the upper (107%) and lower (79.13%) limits, therefore, the assessment is affirmed.

Tax Year 2011

Potential Gross Income
Rental Income for Contractor’s Yard $ 225,336?
Rental Income for Second Garage S 4,872
Income from Residence S 18,000
Total S 248,208
Less
Vacancy & Collection Loss (2%) $ (4,964)
Effective Gross Income (“EGI”) S 243,244
Operating Expenses (6% + insurance S4,916 + Utilities $19,425) $ (38,936)
Net Operating Income S 204,308
OAR at 9 94% Value $2,055,412
Rounded to $2,055,410
ADD' Value of Improvements on Contractor’s Yard $ 49,000*
TOTAL: S 2,104,410
*468 The assessed-to-true value ratio is 102% ($2,139,800/$2,104,410). Thus, the average ratio of 94.87% must be applied which renders the true value as of $1,996,454 rounded to $1,996,455.
In sum, the true value of the Subject is found to be $1,635,800 (2008); $1,735,400 (2009); and $1,996,455 (2011). The assessment for 2010 is affirmed.
The parties are directed to provide an allocation of the above within ten (10) business days of the receipt of this Opinion, after which the court will direct the Tax Court Clerk to enter judgments in accordance therewith. See R. 8:9-3; 9-4.

 Silo’s expert relied upon Belleville’s tax map and property record card to conclude that the Subject is comprised of 2.08 acres. He stated that since there were "many” surveys done for the Subject, each of which showed different sizes, he used the measurements shown on the property record card. When cross-examined that the tax map shows the Subject as having 2.68 acres, the expert maintained that since the assessments were based upon 2.08 acres, his report was proper. Belleville’s expert maintained that the Subject is comprised of 2.691 acres based upon a survey and deed, and the survey was more reliable *431 since property tax cards are more prone to contain mistaken data. The court will use 2.69 acres, the number shown on the deed to the Subject.

 Not included in Belleville's expert report were several other trailers rented to other tenants, all located in the Contractor's Yard and some beyond into land not belonging to Silo. A full physical description of the Trailers and the Quonset Hut is contained in this court's opinion of June 13, 2012.

 The reported income for 2008 to 2011 was $145,936; $163,036; $187,993; and $206,288 respectively.

 The expert-adjusted expenses for each year 2008 to 2011 was $55,367; $72,436.52; $75,404.51; and $81,076.

 See supra n. 8.

 These items were not the subject of the Silo’s in limine motion, and consequently, of any finding by the court as to whether they were taxable as real properly.

 The total of the rent roll was $14,833 not $14,533.

 The gross income included the potential annualized income for the (1) residence; (2) second garage with storage area; (3) storage area next to garage; (4) Brown Trailer; (5) White Trailer; (6) Quonset Hut; and (7) container storage area.

 As noted above, the lease agreements provide that any "equipment, fixtures, goods or other property” left on the Subject either upon lease termination or vacation of the premises becomes the Silo's property, as do any "alterations, additions or improvements” to the leased area.

 in the summary portion of the report, the expert noted the residence as being in zone R-B, however, the portion reproducing the zoning code lists the permitted uses in the R-Al zoning district (which is for single-family homes). Belleville’s zoning Code lists the uses in R-B zoning district as including uses permitted in the RA-1 zoning district.

 Counsel for both parties declined the court’s invitation to brief the conflicting information about the zoning vis-a-vis the residence portion of the Subject. They agreed that the entire Subject lies in the industrial zone, therefore, maintained that this was not a disputed issue given their respective expert's opinions of highest and best use.

 Although he relied upon the income as reported on the tax returns, there was nothing to indicate whether such returns included income from sources other than the rentals from the Contractor’s Yard.

 It should be noted that Silo purchased the Subject with a life interest.