RIMM, J.T.C.
This is a local property tax matter involving valuation and discrimination for the tax year 1989. The property is one of plaintiffs branch bank buildings and is located at 4330 Harbor Beach Boulevard. The property is also known as Block 3804, Lot 4 on the tax records of the City of Brigantine.
For the tax year 1989, the property was assessed as follows:
[[Image here]]
On appeal to the Atlantic County Board of Taxation, a judgment was entered on September 29, 1989 sustaining the assessment. Plaintiff then filed a complaint in the Tax Court seeking a reduction in the original assessment sustained by the county board judgment.
The subject property is located on a corner of the intersection of Harbor Beach Boulevard and Bayshore Avenue. It has a frontage of 150 feet on Harbor Beach Boulevard and a depth of 200 feet on Bayshore Avenue for a total of 30,000 square feet. Harbor Beach Boulevard and Bayshore Avenue are each 100 feet wide at the intersection. The improvements consist of a one-story masonry building containing a total area of 2,360 square feet together with a drive-in facility. The building was constructed in 1975-1976. It has a main banking area with four teller positions, two private offices, two restrooms and a walk-in vault with 536 safe deposit boxes. The building also contains a utility room, a storage area and a kitchenette. There is electric heat and central air-conditioning. There are two walk-in automatic teller windows. The drive-in facility has one window with two remote positions covered by a 660 square feet canopy. The balance of the site is improved with 16 parking spaces, paving, concrete walkways, curbing and landscaping.
*504 Plaintiff's appraiser valued the property by the cost approach and by the income, or capitalization, approach. It was his opinion that the property had a value of $516,300 by the cost approach on the critical assessing date of October 1, 1988 for the tax year 1989. It was his opinion that the property had a value of $421,500 by the income approach on the assessing date. Based on these conclusions, it was plaintiff’s appraiser’s opinion that the subject property had a market value of $440,000 on October 1, 1988.
The data used by the witness, in his cost approach, was taken from the Means Square Foot Cost Guide, Class 2050, for a bank of 2,700 square feet[1], and his “general experience in the real estate business.” His opinion of the cost of the improve-
ments was as follows:
[[Image here]]
The witness reduced this cost by 37.5% for physical depreciation, resulting in a depreciated value of the improvements of $235,091. The witness also testified that the property suffered from economic obsolescence because of the construction of a banking facility in an adjoining shopping center which would be in direct competition with the occupant of the subject property. Such obsolescence was calculated at 25% or $58,773, for a total *505 indicated value of the improvements of $176,318, which the witness rounded to $176,300. The witness added the value of the land as assessed at $340,000 to this value of the improvements for a total indicated value of the subject property by the cost approach of $516,300.
In the income approach to the value of the subject property, the witness used two comparable leases. The first lease involved a 3,800 square feet branch bank in Victorian Village Mall, Washington and Ocean Streets, Cape May, New Jersey. The lease was entered into in July 1987, for a term from July 1987 to June 1990. The indicated rent was $12 a square foot for the first year, $12.36 for the second year, and $12.73 for the last year of the term of the lease, with the tenant to pay taxes. The second lease involved a branch bank containing 3,000 square feet located at 700 Branch Avenue, Little Silver, New Jersey. The lease was entered into on July 13, 1985 for a term of ten years with options to renew. The rent for the first year was $12 a square foot. The rent for the next four years was $16 a square foot. The rent for the last five years of the lease was $20 a square foot. The tenant also paid the taxes for this property. Plaintiff was the tenant in both properties.
Based on these two leases, the witness concluded that the economic rent for the subject property was $20 a square foot for land and building to which had to be added the cost of tenant-supplied additions to the building, both rentals being for “shell buildings.”
The witness concluded that tenant additions were worth $4.27 a square foot based on a value of $82,326 for such additions at a return of 12.25%, or $10,084, which when divided by 2,360 square feet results in $4.27 a square foot. Notwithstanding that the tenants paid the taxes in both comparable leases, the witness indicated that his income approach was based on an economic rent of $24.27 a square foot with the owner paying the taxes, but with the tenant paying all other expenses, including insurance.
Plaintiffs income approach may be summarized as follows:
*506 [[Image here]]
The witness used a capitalization rate of 12.25% to capitalize this income and arrived at a value of $421,453, rounded to $421,500, as the indicated value of the subject property by the income approach.
The capitalization rate was based on a 25% equity investment at an 8% return, for a 2% equity factor; a 75% first mortgage at 10.50% interest for 25 years, with a constant of 11.34% or 8.50% for the mortgage factor. The total rate of return, therefore, was 10.50%. To this, a tax factor was added of 1.75%, the effective tax rate based on a tax rate of $1,872 multiplied by 93.41%, the chapter 123 ratio for Brigantine for the tax year 1989. This produced the total capitalization rate of 12.25%.
The municipality called an appraiser as its only witness. It was his opinion that the property had a fair market value of $890,500 as of October 1, 1988. He arrived at his opinion of value based solely on the cost approach. He said he considered the other approaches but rejected them “for various reasons.” For example, he said that he did not use the income approach because he could not find other branch banks which had been leased in Brigantine.
In valuing the property by the cost approach, the appraiser utilized the Marshall and Swift cost valuation manual to determine the replacement cost for an average class C bank building.[2] He observed normal wear and tear in a building the age *507 of the subject, and also indicated that there was no economic obsolescence. With regard to physical depreciation, the witness said he “typically” uses an economic life of 50 to 60 years, and in this case, he used an economic life of 55 years. He also said that the subject property had an effective age, for appraisal purposes, of ten years. He then used Marshall and Swift and concluded that, based on a typical life expectancy of 55 years, and an effective age of ten years, physical depreciation amounted to 4%, the exact amount indicated in the Marshall and Swift table. The witness indicated in his appraisal that the improvements were built in 1975.
By use of the Marshall and Swift service, the witness concluded that the depreciated value of the improvements was $275,500. His replacement cost now may be summarized as follows:
[[Image here]]
The witness applied a 1990 cost conversion factor of 1.18 to this total. He then discounted the result back to 1988-1989 and concluded that the replacement cost new of the improvements was $272,424. To this he added $15,000 for landscaping and signs for a total of $287,424, rounded to $287,400. He then allowed physical depreciation of 4% in the amount of $11,500 and concluded that the depreciated value of the improvements was $275,500.
The witness then valued the land, using three comparable land sales. Based on the three sales, to which he made various adjustments for time, location, corner influence and size/shape, he concluded that the subject property had a fair market value *508 of $15.50 a square foot as of the assessing date, for a total land value of $615,000.
Contrary to the opinion of the taxpayer’s appraiser, the municipality’s witness was of the opinion that the adjoining shopping center would dramatically increase traffic in the area. This fact, together with the fact that the subject property has very good automobile ingress and egress, would result in a positive influence on the subject property. In addition, the immediately adjoining property to the subject property is the Brigantine Post Office, and the subject property itself is on a corner lot and has the advantages of comer exposure. Finally, this witness pointed out that the location of the new branch bank in the shopping center to which plaintiff’s appraiser referred, and on the basis of which he found economic obsolescence of 25%, was previously occupied by another bank which moved out of that location to a new branch bank building not located in a shopping center.
On cross-examination, the municipality’s witness acknowledged that each one of the three comparable land sales involved lots in the B-l Commercial Zone, but the subject property is in the B-3 Commercial Zone. However, the witness said that the three lots were comparable to the subject property due to the “size and physical limitations” of the comparables and the subject property. He also concluded that the two zones were comparable.
Plaintiff’s cost approach is rejected. There is no evidence of the value of the land, an obviously essential element of the proof of value by the cost approach. The appraiser has the responsibility of inspecting the neighborhood, the site, and the improvements, and after gathering all relevant data, of following certain steps to ascertain value by the cost approach. The first step requires the appraiser to “[ejstimate the value of the land as though vacant and available to be developed to its highest and best use.” American Institute of Real Estate Appraisers, The Appraisal of Real Estate (9 ed 1987) at 350. The appraiser failed to comply with this standard procedure. *509 Instead of valuing the land in accordance with accepted appraisal practice, he claimed that the value of the land was the same as the land assessment.
The land assessment cannot be evidence of value, “the allocation [in a local property tax assessment] between land and improvements being merely an administrative act.” N.J. Foreign Trade Zone Venture v. Mt. Olive Tp., 10 N.J.Tax 330, 335 (Tax Ct.1989) affirmed 242 N.J.Super. 170, 576 A.2d 303 (App. Div.1990). The leading local property tax assessment case of In re Appeals of Kent 2124 Atlantic Ave., Inc., 34 N.J. 21, 166 A.2d 763 (1961), makes this perfectly clear.
A taxpayer who seeks a reduction of an assessment below true value must prove that his share of the total tax burden substantially exceeds the share allocated to others generally. If his proof does not meet that test, it would be of no moment that the assessment of either his land or his building would be excessive if separately measured against the general treatment of land or of improvements respectively. Indeed he would receive an undue advantage if he could confine his proof in a case of this kind to the treatment of only land or building and have the trier of the facts assume the assessed valuation of the other accords with true value. The burden is his to establish with independent proofs the true value of the parcel with its improvements and that the total assessment of the improved parcel substantially exceeds the ratio of assessment of real property in the taxing district. By the same token, if the taxpayer meets that burden, he is not concerned with such allocation of the resulting figure between land and improvements as may be made administratively for some other purpose. This is not to say that evidence may not be offered as to the value of land and of building separately as a step in the process of proving the total value of land and building as an entity; rather the point is that relief is not warranted unless the total treatment of the parcel as improved violates the existing rule of equality. [Id. at 33-34, 166 A.2d 763; emphasis supplied.]
Plaintiffs expert’s income approach is also deficient. Both of the comparable rentals used by plaintiff’s expert involve “shell buildings” which required tenant improvements. An appraiser should ascertain the facts relating to these improvements in order to determine the cost to the tenant, and hence the rent paid. “Typical lease data include the lease date, a legal description of the leased property ... [and] specifications concerning tenant improvements____” American Institute of Real Estate Appraisers, op. cit., supra at 466; emphasis supplied. Specifications concerning tenant improvements were *510 not given by plaintiffs expert for either of his comparable rentals. Yet,
[e]xtensive tenant improvements can influence lease rent. When capital expenditures are made by the lessor, reimbursement may be accomplished through rent increases that amortize the lessor’s expenditures over all or part of the lease period. If capital expenditures are made by the tenant, the lessor may lower the tenant’s rent below market levels for all or part of the lease term. [Id. at 435.]
Tenant improvement cost specifications should have been supplied for the comparable rentals. In their absence, it is impossible to determine if the tenant improvement factor of the economic rent used by the witness is correct.
The witness used $4.25 (rounded from $4.27) a square foot as the annual rental value of the tenant improvements. He did this by determining what a lessor would charge for such improvements, not what was paid by the tenants in the comparable properties. This factor was based on the return to the lessor on $82,326 as the cost of tenant improvements in the subject property. This is a cost approach, not an attempt to determine economic rent. In this regard, it must be noted again that both comparable leases involve plaintiff as the tenant. It may reasonably be concluded that the information relating to tenant improvements and their impact on the rent was easily obtainable. In addition, a tenant paying rent over a period of years rather than paying a lump sum at one time in advance at the inception of the lease, would be willing to pay more a square foot, but no evidence on the point was presented.
Secondly, no adjustments were made to the rentals in the comparable leases for time. In the income approach to value, the first step to be taken is the determination of economic rent. Economic rent is “the rental income the property would most probably command in the open market”. The Appraisal of Real Estate, supra at 466. In order to determine economic rent, time adjustments to the rentals of comparable properties are to be made to reflect economic rent on the appraisal date. This is done in the same way that time adjustments are made to comparable sales when comparable sales are used in the sales comparison approach to the market value of real estate.
*511 Third, there was no adjustment for location. One comparable is in Cape May County and one is in Monmouth County, both of which counties may involve different markets for branch banks. In addition, I agree with defendant’s assessor that the location of the subject property is a distinct advantage for a branch bank. Yet, there also was no comparison of the subject with the comparables as to their locations within the respective municipalities.
Fourth, the two comparable rentals involve “net leases” by the provisions of which the tenants pay taxes. Plaintiff’s appraiser’s testimony may have been self-contradictory on this point. During direct examination, he testified that the two comparables involved leases in which the tenants paid the taxes. His appraisal, marked in evidence, stated, under “Capitalization Approach,” the following: “The gross annual income is based on $24.25 per square foot for 2,360 square feet. The estimated rental is on a net basis with tenant paying all expenses including taxes and insurance.” During his testimony, the appraiser indicated that the quoted sentence should be changed to read: “The gross annual income is based on $24.25 per square foot for 2,360 square feet. The estimated rental is based on the tenant paying all expenses including insurance.” The second form of the sentence does not necessarily exclude taxes from “all expenses.” Since net leases normally involve the paying of taxes by the tenant, the appraiser could merely be emphasizing the fact that, in the comparable leases he considered, the tenant also paid insurance. In addition, under “Lease Data” for the comparable rental with a three-year term, the appraisal reads as follows: “This is an absolute net agreement.” Emphasis supplied.
I find as a fact from the totality of the evidence that the two comparable sales were net leases by which the tenants were obligated to pay taxes, among other expenses. Since the com-parables involve net leases, the income approach for this subject property should be based on a net lease. Accordingly, there should be no tax factor in the capitalization rate. Humble Oil and Refining Company v. Englewood Cliffs, 71 N.J. *512 401, 365 A.2d 929 (1976). Of course, this defect in plaintiff's income approach can be remedied based on the record before me. The remedy would be to eliminate the effective tax rate as part of the capitalization rate. However, in the absence of proof by a preponderance of the credible evidence to establish economic rent, the income approach to value the subject property simply cannot be used.
One other item in the income approach, although minimal, should be noted. Plaintiff’s expert deducted $555 for miscellaneous expenses, without any explanation, or even comment. In the absence of any explanation, a deduction for miscellaneous expenses for the real estate when there is an “absolute net” is not acceptable.
Defendant’s cost approach is also rejected. Its expert’s opinion was that the land had a value of $615,000 on the assessing date. This opinion was based on three allegedly comparable land sales. The sales all involved properties in a land use zone with requirements so different from the land use zone in which the subject was located that the comparables are useless as a basis for valuing the subject.
Under Brigantine’s existing zoning ordinance, the subject property is located in the B-3 Commercial Zone. Uses permitted in this zone include shopping centers, banks, restaurants, motels/hotels, and marinas. The minimum lot size for the construction of a bank is 30,000 square feet. Floor area restrictions require that the gross leasable area of the commercial and business uses shall not exceed 150% of the total site area or be less than 25% of the total site area. In determining the commercial and business use mix, retail service establishments shall not exceed 60% of the occupancy of the gross leasable area. Bulk requirements for a bank are as follows:
[[Image here]]
*513 Parking areas as an accessory use for a bank shall provide for a minimum set back of 15' from any property line unless superseded by the requirements of the section on landscaping, buffers and open space design.
However, all three comparable sales are located in the B-l Commercial Zone. This zone provides for a minimum lot size of 3,600 square feet for retail use. There are also 20 permitted uses in this zone. Hence, the permitted density in the B-l Zone is significantly greater than the permitted density in the B-3 Zone, and significantly more uses are permitted in the B-l Zone.
Defendant’s appraiser attempted to overcome this deficiency in his cost approach by adjustments to the land sales for size and shape, although he acknowledged he made no adjustments for differences in zoning. The adjustments for size and shape, though useful when comparing properties in the same land use zone, completely ignored the significant density and permitted use differences between the two zones. The adjustments did not negate these significant differences. In this case, these significant differences preclude comparability of land in the one zone with land in the other zone.
Zoning is often the most basic criterion in selecting comparables. Sites zoned the same as the subject property are the most appropriate comparables. If sufficient sales in the same zoning category are not available, data from similar categories can be used after adjustments are made. As a general rule, the greater the dissimilarity between the subject and the comparables, the more potential there is for distortion and error in sales comparison. [American Institute of Real Estate Appraisers, op. cit., supra at 302; emphasis supplied].
Plaintiff having failed to prove the value of the subject property by a preponderance of the credible evidence, the complaint is dismissed. The Clerk of the Tax Court will enter a judgment accordingly.

 So designated in his appraisal.

 So designated in his appraisal.