TAX COURT OF NEW JERSEY

Hon. Mary Siobhan Brennan, J.T.C.
JUDGE
10 S. Broad Street, 5th Floor
Trenton, New Jersey 08608
(609) 815-2922, Ext. 54560

September 28, 2018

Archer & Greiner, P.C.
Alex Paul Genato, Esquire
101 Carnegie Center, Suite 101
Princeton, New Jersey 08540

Palumbo Renaud & DeAppolonio LLC
Robert F. Renaud, Esquire
190 North Avenue E (Rte. 28)
Cranford, New Jersey 07016

Via ECourts

   RE: HPT TA Properties Trust v. Bloomsbury Borough
      Docket Nos. 008898-2014, 002900-2015, 001751-2016, 004400-2017

Dear Mr. Genato and Mr. Renaud:

This constitutes the court's opinion after trial in the above-referenced matters.

Plaintiff, HPT TA Properties Trust ("taxpayer") is the owner of real property located in defendant, Bloomsbury Borough ("borough") in Hunterdon County. The property site consists of two non-contiguous tax parcels of land identified on municipal tax records as Block 30, Lots 3 (12.2 acres) & 4.01 (1.45 acres) containing a total land area of 13.47 acres. Taxpayer challenges the borough's assessment of its real property taxes on both lots for years 2014, 2015, 2016 and 2017.

The court finds that as to Block 30, Lot 4.01, taxpayer has not proved by a preponderance of the credible evidence that the assessment is incorrect, and the court affirms that assessment. As to Block 30, Lot 3, the court finds that the taxpayer has met its burden of proof by a preponderance

1

of the credible evidence that the assessments are incorrect and that the true market value exceeds the statutory limitations established by N.J.S.A. 54:51A-6(a), commonly known as Chapter 123.

I. *Procedural History*

Taxpayer's four tax appeals were timely filed and were consolidated for purposes of trial. The matter was tried on July 30 and 31, 2018.

At the beginning of the trial, the parties informed the court that they had reached a stipulation as to certain matters. Specifically, the parties advised the court that both of their experts had rejected the Sales Comparison and Income Capitalization Approaches to value, and both experts had relied upon the Cost Approach[1] to valuation because of the unique and specialized use of the property.

The experts were in agreement that the Sales Approach was not useful in determining the true value of the property due to the uniqueness of the property and the lack of comparable sales (a sentiment echoed by the assessor during her testimony.) The experts also agreed that there was difficulty and unreliability in allocating the values for the real estate, furniture, fixtures and equipment, and the business value when performing a sales comparison analysis of other potential similar types of properties.

---

[1] Real property in New Jersey is assessed according to its "true value", which is synonymous with "market value" and "full and fair value", as that term is used in N.J.S.A. 54:4-23. New Jersey courts have held, consistent with established appraisal principles, that property can be valued according to three valuation methods: comparable sales, capitalization of income and depreciated reproduction cost ("Cost Approach"). See New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537 (1963); Pantasote Co. v. Passaic, 100 N.J. 408 (1985). See also Appraisal Institute, The Appraisal of Real Estate at 44 (14th ed. 2013). The Cost Approach consists of two components, land (or site) value, and the replacement cost of improvements. Where the improvements are not new, this approach to valuation uses the depreciated replacement cost of the improvements.

In addition, both experts were of the opinion that the Income Capitalization Approach was not useful because the allocation of revenue to the various tangible and intangible component parts of the business, the furniture, fixtures and equipment, and the real estate would not be reliable. The court was advised that typically this type of property is owner occupied and considered a "special" use type of asset. As such rental data is not readily available in the taxpayer's market area.

The court found credible the opinions of the experts that the property is a limited market, special purpose property. The improved structures were designed for a specific use and would likely require significant alterations to be put to any other use. In addition the property's location is paramount and specific to its use and purpose. The court recognized that the Cost Approach was the most credible method of determining value in light of the special nature of the property and the dearth of reliable sales and income data.

Counsel placed on the record the following stipulations with respect to the Depreciated Replacement Cost of Improvements[2]:

| | |
|---|---|
| 2014 | $2,647,350 |
| 2015 | $2,638,483 |
| 2016 | $2,597,386 |
| 2017 | $2,461,079 |

---

[2] In his post-trial brief, Defense counsel indicated that since the depreciated improvement cost determined by both appraisers was close, plaintiff's appraiser having a higher value in the first two years and defendant's appraiser having a higher value in the second two years, the parties agreed to stipulate to the depreciated improvement cost for all tax years under appeal by averaging the two estimates.

The court accepted the parties' stipulation as to the Depreciated Cost of Improvements values, and the trial proceeded on the remaining issue of land value.

During the trial, the borough assessor testified, and each party presented an expert real estate appraiser who offered an opinion of the true market value of the land component of the property on each of the relevant valuation dates. The court accepted the qualifications of both experts without objection from opposing counsel. Both experts agreed that the highest and best use of the property "as improved" and "as vacant" is its continued use as a truck stop/travel center, and the court accepted this opinion of highest and best use.

The expert opinions of land values are summarized as follows:

| Tax Year | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| Valuation date | 10/1/2013 | 10/1/2014 | 10/1/2015 | 10/1/2016 |
| Plaintiff's Expert | $ 890,000 | $ 890,000 | $ 890,000 | $ 890,000 |
| Defendant's Expert | $3,785,000 | $3,785,000 | $3,910,000 | $3,910,000 |

At the conclusion of the taxpayer's case, the borough moved for dismissal pursuant to R. 4:37-2(b), arguing that the taxpayer's claims should be dismissed because the land sales chosen by taxpayer's expert were not comparable and were largely non-useable sales that were not arm's length transactions. Taxpayer's attorney argued against the motion, asserting that the proposed comparable sales were sufficiently comparable to the taxpayer's property to overcome the presumption of validity.

The court denied the borough's motion ruling that the opinions of value offered by taxpayer's expert, were based on accepted methodologies for determining the value of real property, and if accepted as true, raised doubt in the court's mind as to whether the assessments exceeded the market value for the tax years at issue.

4

The borough then presented the testimony of its expert, who testified as to his selection of comparable land sales. At the conclusion of the trial, and in a subsequent telephone conference, the court requested that counsel submit closing briefs. The court was specifically concerned with the lack of any comparable land sales with the same zoning and/or highest and best use as the taxpayer's property. Given the assessor's testimony that the assessment had been formulated on a Cost Approach basis by a revaluation company many years earlier, the court specifically asked counsel to address the issue of whether the court should affirm the land value assessment and reconcile that value with the previously stipulated depreciated cost of improvement value to determine current market value.

Counsel for the Borough submitted a letter brief on August 17, 2018 and taxpayer's counsel submitted a letter brief on September 14, 2018.

## II. Findings of Fact

The following findings of fact and conclusions of law are based on the evidence and testimony admitted at trial.

### Location of the Property

As previously stated, taxpayer's property consists of two non-contiguous tax parcels in Bloomsbury Borough, Hunterdon County, and is situated within the NJ Highlands Planning Area.[3]

---

[3] The Highlands Water Protection and Planning Act ("Act"), N.J.S.A. 13:20-1 to -35, is a 2004 law aimed at protecting the Highlands Region of northwest New Jersey by regulating development within the region under the supervision of the New Jersey Department of Environmental Protection. The Highlands area includes specified municipalities in Bergen, Hunterdon, Morris, Passaic, Somerset, Sussex and Warren counties. The Highlands Planning Area is the portion of the Highlands Region that is not included in the Highlands Preservation Area. While the Act does not establish any new standards for the Highlands Planning Area, the Highlands regional master

The street address is 975 Route 173, and ingress and egress (Lot 3 only) are provided along the north side of Route 173. Most significantly, the property is in close proximity to a full exchange at Interstate 78. Although not directly accessible, Lot 3 has 735 feet along the south side of Interstate 78.

Route 173 is a state highway that is a designation for an old section of U.S. Route 22. The transportation route runs approximately 14.5 miles from Interstate Route 78 and U.S. Route 22 in Greenwich Township, Warren County to County Road 626 in Clinton Township, Hunterdon County. In the immediate area of the taxpayer's property, Route 173 is developed with commercial properties including an adjacent Pilot Travel Center, a Brown's Hunterdon Mack Sales & Service (contiguous to taxpayer's property), a Citgo gas station, and a PNC bank branch. Commercial development in the area is primarily due to the proximity to a four way Interchange with Interstate Route 78 (Exit 7), with both west and east bound access supporting the current uses.

To the southwest, the borough is established with residential neighborhoods with pricing ranging from $125,000 to $450,000 +. Most properties are between 10 and 65 years old and are well maintained. Bloomsbury is the third smallest municipality in Hunterdon County with an estimated population of 870 persons. Generally outside of the borough, the neighborhood is rural in nature along Route 173. This section of Hunterdon County is not as densely populated as areas to the east and south, and there are several agricultural properties in the area as well as the state line between New Jersey and Pennsylvania, which is located approximately 6.5 miles to the west.

---

plan, which must be adopted by the Highlands Water Protection and Planning Council, provides an avenue for enhanced standards, TDR and smart growth in this portion of the Highlands region.

The property's location is most notably on a major transportation and trucking route. In addition to its easy access to Interstate 78, it also assists in servicing a large warehouse and distribution region in Pennsylvania in concert with Interstate 81. Its proximity to northern New Jersey and New York also make it an ideal location for resting and preparing for early hour transportation into those generally highly congested areas.

The Property

*Block 30 Lot 4.01* is a slightly irregular parcel of land with 314 feet abutting the Musconetcong River. The property is used as a retention basin in connection with Lot 3. The retention basin has minimal improvements and is essentially a rectangular area excavated and surrounded by an earthen berm on all sides with a tarp placed over the excavated area to retain water. The area of the retention basin is 100 feet by 75 feet and approximately 2-3 feet deep. The property is 1.45 acres in size and unimproved except for the retention basin area and its surrounding fence. The remainder of the site has trees and grassy areas. There are no curb cut-ins along State Route 173. Lot 4.01 is separated from Lot 3 by a lot owned by a separate non-related entity.

*Block 30 Lot 3* ("subject property") is mostly irregular in shape. It is large for a local commercial property, although its size is typical for its current use as a truck stop/travel center. It has average depths and no known easements, encroachments or adverse conditions affecting marketability. The topography is predominately level at street grade. It is located in Flood Hazard Zone X which is an area that is outside of a flood hazard zone, and there is adequate drainage.

The site does not have access to a public sewer/wastewater disposal system and relies upon a septic field wastewater treatment system situated in the northwestern quadrant of the site, which is characteristic of property in this area of Hunterdon County. The property did not have access

to municipal/public water supply until June 2014, at which time the taxpayer paid to connect to the borough water supply.

Zoning

The subject property is located within the B-2 Highway Business District.

The permitted uses are churches or similar places of worship; cemeteries; commercial and general business oriented toward highway use including, automobile showrooms, campus style office (non-manufacturing) complexes, retail stores, family restaurants, wholesale stores and distributors in a completely enclosed building but not involving the processing or treatment of goods or products; personal services, professional offices and other uses including or similar to churches or other places of worship, medical clinics or laboratories serving medical and dental requirements, offices or office buildings for physicians, dentists, lawyers, engineers, architects, real estate brokers, stockbrokers and related uses; scientific research laboratory or other experimental, testing or research establishment, including applied research, such as product development, theaters (but not including drive-in theaters), printing, lithography, publishing and photostatting establishments, lodges, clubhouses or fraternal organizations; and such municipal or public buildings, parks and other municipal facilities or properties, of a character not customarily conducted as a gainful business, as deemed appropriate by the governing body.

The zoning also permits the following accessory uses: private garages necessary to store vehicles on the same lot; and any accessory use on the same lot with and customarily incidental to any use permitted in the district. Conditional uses are drive-in restaurants, automobile and/or trailer sales, motels, off-street parking, signs and automobile gasoline filling stations (without repairs), however such stations shall be permitted only upon those properties where the same are located or approved as of June 30, 1998. No further automobile gasoline filling stations shall be

8

permitted in the B-2 Highway Business District. The intent of this provision is to eliminate such use in the district as a use permitted under any circumstances, but to permit those properties upon which such uses are currently located so as to continue as a conditionally permitted use.

Based on a review of the ordinance, the court finds that the subject property's use as a truck stop/travel center is a blend of multiple uses listed within the zoning ordinance. As such the current use is a legal, pre-existing, non-conforming use of the site.[4] The court also accepts the testimony of both experts that they were unaware of any zoning ordinances that included a specific category for a truck stop/travel center.

Highest and Best Use[5]

---

[4] Taxpayer's expert came to this conclusion while the borough's expert found that it was a legal, conforming use within the zone.

[5] The essential components in an analysis of a property's highest and best use is defined as "the reasonably probable use of property that results in the highest value." Appraisal Institute, The Appraisal of Real Estate, 332 (14th ed. 2013). Highest and best use analysis requires sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive. Ford Motor Co. v. Edison Tp., 10 N.J. Tax 153, 161 (Tax 1988); see also The Appraisal of Real Estate at 332. Implicit in this analysis is the assumption that the proposed use is market-driven; in other words, that it is determined in a value-in-exchange context and that there is a market for such use. WCI-Westinghouse v. Township of Edison, 7 N.J. Tax 610, 616-17 (Tax 1985), aff'd o.b., 9 N.J. Tax 86 (App. Div. 1986). A highest and best use determination is not based on value-in-use because the determination is a function of property use and not a function of a particular owner's use or subjective judgment as to how a property should be used. See Entenmann's Inc. v. Borough of Totowa, 18 N.J. Tax 540, 545 (Tax 2000). The highest and best use of an improved property is the "use that maximizes an investment property's value, consistent with the rate of return and associated risk." Clemente v. Tp. of S. Hackensack, 27 N.J. Tax 255, 268 (Tax 2013). Further, the "actual use is a strong consideration" in the analysis. See 10 N.J. Tax at 166-67.

Both experts agreed that the highest and best use of the subject property "as improved" and "as vacant" would be for its current use. All of the 4 tests of highest and best use are satisfied. The use as a truck stop/travel center is physically possible, based on the current site characteristics and development trends. It is financially feasible assuming area vacancy rates remain at the current moderate levels. It would be maximally productive within the zoning regulations based on the demand for this type of facility, within this area of the county, based on current market trends, past market activity, and neighborhood compatibility. In addition, the current configuration and functional layout of the buildings support the highest and best use as a truck stop/travel center as the structures are well–maintained and have not reached the end of their economic life.

Redevelopment of the buildings into another use is not considered a feasible option based on its current use and occupancy history at the site. The close proximity to a four-way interchange with Interstate I-78 further supports the current use of the subject property. The subject's location alongside Interstate 78, and its close proximity to Interstate 81 is ideal. This interstate corridor services one of the largest warehouse distribution routes in the United States, which in turn, supports truck stops along four-way interchanges, as well as truck service/repair and showroom facilities that are noted to be in the subject property's immediate neighborhood.

Improvements on the Subject Property (Lot 3)

The site was constructed in 1975 with various updates over the years. The last recorded sale of the property was on November 14, 2000 for a reported consideration of $3,158,000.[6]

_____

[6] The sale was marked NU-3 non-useable because it occurred between two related corporate entities.

Lot 3 of the property is improved with three major structures and an Exxon gas station. There is a Main Building and Travel center consisting of a first floor and partial second floor masonry and steel retail building containing approximately 20,000 square feet inclusive of the approximately 3,500 square feet of second floor space. The first floor is occupied by a travel store, a Country Pride restaurant, a Burger King, an arcade, restrooms, a driver's lounge, seven showers, a coin-operated laundry, and an office. The second floor was previously used as a six room motel with showers, but is now used for dead storage only and is in poor condition.

The second improvement on Lot 3 is a truck repair garage consisting of a one story block and corrugated metal panel repair garage with four double repair bays with high bay ceilings (approximately 18 feet) with eight 10 foot by 16 foot steel overhead doors. The building area is approximately 9,100 square feet.

The third improvement on Lot 3 is a truck refueling station which consists of nine double-sided diesel pumps/dispensers. The station is protected from the elements by a large, lighted metal/aluminum canopy with a covered area of approximately 5,800 square feet. There are four 20,000 gallon underground diesel tanks that are approximately 35 years old.

The gas station consists of an outdoor truck refueling station with four double-sided pumps/dispensers. The station is protected from the elements by a large, lighted, metal aluminum canopy with a covered area of approximately 1,900 square feet. There are two underground tanks: a 20,000 gallon underground tank for regular gasoline, and a 10,000 gallon underground tank for super octane gasoline. Both tanks are also approximately 35 years old.

An additional improvement is an asphalt paved driveway and parking area. There are 122 lined spaces for trucks, as well as an additional 93 striped spaces for autos. The total paved area is approximately 8.72 acres. There are also lighting fixtures, sidewalks, concrete pads,

11

landscaping, a septic field and treatment plant, and a 200,000 lb. Fairbanks 2600 Platform truck scale.

Overall the site improvements are in average condition.

**Tax Assessment**

For the tax years in question, Lot 4.01 was assessed as follows:

| Tax Year | Land | Improvements | Total |
|---|---|---|---|
| 2014 | $122,500 | $0 | $122,500 |
| 2015 | $122,500 | $0 | $122,500 |
| 2016 | $122,500 | $0 | $122,500 |
| 2017 | $122,500 | $0 | $122,500 |

For the tax years in question, the subject property (Lot 3) was assessed as follows:

| Tax Year | Land | Improvements | Total |
|---|---|---|---|
| 2014 | $2,404,000 | $3,417,800 | $5.821,800 |
| 2015 | $2,404,000 | $3,417,800 | $5,821,800 |
| 2016 | $2,404,000 | $3,417,800 | $5,821,800 |
| 2017 | $2,404,000 | $3,417,800 | $5,821,800 |

The Director's (Chapter 123) ratio for Bloomsbury for each year under appeal was as follows:

| Tax Year | Average Ratio |
|---|---|
| 2014 | 100.00% |
| 2015 | 100.00% |
| 2016 | 95.57% |
| 2011 | 93.48% |

A. **Summary of Testimony**

1. Borough Tax Assessor.

The first witness to testify was Eloise Hagaman, Bloomsbury's Tax Assessor. She is a certified tax assessor and a state certified residential real estate appraiser, but not a state certified general real estate appraiser.

Ms. Hagaman stated that the assessment has remained unchanged since a revaluation was done by Appraisal Systems in 2006. She testified that the land assessment on Lot 3 had been set at $200,000 per acre by the revaluation company using a "formula", and that Lot 4.01 was set lower at $125,000 per acre. The assessor was familiar with the 2006 Appraisal Systems report and was aware that the company utilized the Cost Approach, however there were no land sales in the report.

The properties were reassessed in 2010 and again 2014, and on each occasion the assessor decided to maintain the same assessments. In terms of any independent investigation she stated that if there were comparable sales she would have considered them, but there were none.[7] As to her reasons for maintaining the 2006 assessment figures through the relevant tax appeal dates, the assessor noted that (1) there was an a Pilot truck stop one exit away in another municipality on Route 78, situated on 11 acres, that had sold in 2007 for $6 million, which led her to consider that

---

[7] Taxpayer's attorney inquired of Ms. Hagaman, as to how the tax assessment of the property was made. Defense counsel objected stating "If he is attempting to use her testimony to establish land value I object." The basis of the objection was that expert testimony cannot be compelled. See Fitzgerald v. Stanley Roberts, Inc. 186 N.J. 286, 299 n.7 (2006), citing Graham v. Gielchinsky, 126 N.J. 361, 369 (1991) (noting New Jersey in minority of jurisdictions not permitting compulsion of expert testimony) and Genovese v. N.J. Transit Rail Operations, Inc., 234 N.J Super. 375, 380 (App. Div. 1989) (holding opinion of expert may not ordinarily be compelled against expert's wishes), certif. denied, 118 N.J. 195 (1989). The court in sustaining the objection ruled that Ms. Hagaman had not been qualified as an expert witness and indicated that she could only testify as to how the assessment came about, not about the land values.

"This is what a truck stop could be worth," and (2) the taxpayer had filed a tax appeal for tax year 2007 and had withdrawn it, which led her to believe that her assessment was correct.

Taxpayer's Expert

The taxpayer's expert Joseph Hiller, testified that the highest and best use of the subject property as improved and as vacant was the continued use as a truck stop/travel center. He indicated that he considered the three approaches to value. He did not use the Comparable Sales Approach because he was unable to find comparable sales. He considered but did not use the Income Capitalization Approach because the income from the subject property was derived from the business and could not be attributed strictly to the real estate. He indicated that separating out the income derived from the business operations and the real estate could not be done, because there was insufficient data to render a conclusion of value of the businesses related to a truck stop. He also testified that he had difficulty finding competitive leases to find value using the Income Capitalization Approach. Due to the foregoing, he relied on the Cost Approach.

Inasmuch as the depreciated replacement cost of the improvements was stipulated to by the parties, his testimony concentrated on the land component of the real estate. The appraiser selected land sales with a focus on four factors: (1) land with zoning as close to the same zoning as the truck stop/travel center; (2) land which lacked infrastructure for water and sewage[8]; (3) land

_____

[8] The appraiser limited his search to land sales in Hunterdon County most of which did not have utilities such as public water and sewer servicing the properties   His rationale was that for all land valuation dates in question (October 1 of 2013, 2014, 2015 and 2016) the subject premises had an onsite sewage treatment facility. Additionally, for the valuation dates for the 2014 and 2015 tax years, the subject did not have a public water service (public water was accessible to the subject property prior to the valuation date for 2016 and 2017tax years).

located within Hunterdon County; and (4) land in close proximity to Interstate 78 or other roads frequently traveled by trucks.

The appraiser offered eight comparable land sales, all of which involved non-developed land. He could find no land sales that specifically had zoning as a truck stop/travel center, nor could he locate land sales with the same highest and best use (a truck stop/travel center.)

Many of the comparable sales were non-usable sales. Several of them were farms that continued to be used for farmland purposes and one involved a sale of land to a municipality for preservation purposes. Some had environmental constraints, including streams and wetlands. One was in the Highlands Preservation Area and was undevelopable (it was eventually sold to the son of a neighboring property owner, who did not want to see it developed.) Five of the eight sales closed between June 7, 2010 and September 14, 2012, well before the October 1, 2013 valuation date for the 2014 through 2017 tax years in question. One was residentially zoned property that was subdivided into residential building lots.

After making adjustments for conditions of sale, necessary approvals and shape and topography, the taxpayer's appraiser's opinion of value of the land component of the subject

property was $60,000 per acre,[9] plus an added ten percent for entrepreneurial profit premium,[10] for all tax years under appeal. The taxpayer's appraiser combined Lots 3 and 4.01 for a total land area of 13.47 acres. After adding the stipulated depreciated replacement cost, his opinion of value of the combined Lots 3 and 4.01 (13.47 acres) for the tax years in question was:

| Tax Year | Land | Improvements | Total |
|---|---|---|---|
| 2014 | $890,000 | $2,647,350 | $3,537,350 |
| 2015 | $890,000 | $2,638,483 | $3,528,483 |
| 2016 | $890,000 | $2,597,386 | $3,487,386 |
| 2017 | $890,000 | $2,461,079 | $3,351,079 |

Borough's Expert.

---

[9] Both appraisers gave both a per acre value and a per square foot value. Since the assessor testified to a value per acre, the court adopted this measure of value.

Although not mentioned in this matter, the court notes that land value is also derived and dependent upon its density. For many years vacant land had been valued according to its per acre selling price, and all comparable sales were converted to a price per acre. See, e.g., Venino v. Carlstadt, 1 N.J. Tax 172 (Tax 1980), aff'd o.b., 4 N.J. Tax 528 (App. Div. 1981); Riorano v. Weymouth Twp. 4 N.J. Tax 550 (Tax 1982) aff'd o.b. 6 N.J. Tax 253 (App. Div. 1983); Newark City v. Cedar Grove Tp., 7 N.J tax 66 (Tax 1984). Since about 1988, however, appraisers appearing in the Tax Court have valued vacant land zoned for development, whether residential, commercial, or mixed, according to the parcel's buildable density, that is to say, the price depends upon how many units can be built upon the parcel. Frieman v. Randolph Tp., 8 N.J. Tax 264 (Tax 1986), aff'd 216 N.J. Super. 507 (App. Div. 1987); Romulus Dev. Corp. v. Weehawken Twp., 15 N.J. Tax 209 (Tax 1995).

[10] "Entrepreneurial profit" is defined as a market-derived figure that represents the amount an entrepreneur receives for his or her contribution to a project and risk; the difference between the total cost of a property (cost of development) and its market value (property value after completion), which represents the entrepreneur's compensation or the risk and expertise associated with development. See The Appraisal of Real Estate at 573.

The borough offered the testimony of expert real estate appraiser Timothy Hoffman. After providing a description of the site and subject improvements, he testified that the value of the subject site as a truck stop/ travel center was principally defined by its location in the immediate proximity to a four way interchange off of Interstate Route 78, a major east-west truck traffic route. He emphasized that the site was fully utilized with two restaurants, multiple diesel pumps, gasoline pumps (also servicing automobiles), and a truck repair facility. Due to its location, truckers could stop there for the evening and then proceed to points east, including the New York metropolitan area, at an early hour before other vehicular traffic congested that area. He indicated that this type of facility along I-78 in New Jersey made this location particularly valuable. This opinion he stated was reinforced by the presence on the adjacent parcel of a smaller Pilot truck stop and a very busy gasoline service station across Route 173.

Since the depreciated replacement cost had been stipulated, his testimony concentrated on the land value. He testified as to eight comparable land sales, none of which were for truck stop or travel centers, and none of which had the same zoning or highest and best use. The appraiser characterized his comparable land sales as mostly high-volume locations with a considerable amount of truck traffic, some of which were located in close proximity to an interchange of the New Jersey Turnpike or other interstate highways.

The sale dates ranged from February of 2013 to December of 2016. Five of the land sales were zoned Industrial and three were zoned Commercial. Only one was in Hunterdon County and only three were in the Highlands Region. Adjustments were made for location, lot size and physical characteristics. His opinion of land value was $315,000 per acre for the 2014 and 2015 tax years and $325,000 per acre for the 2016 and 2017 tax years.

After adding the stipulated depreciated replacement cost, his opinion of value of the subject property for the tax years in question was:

| Tax Year | Land | Improvements | Total |
|---|---|---|---|
| 2014 | $3,785,000 | $2,647,350 | $6,432,350 |
| 2015 | $3,785,000 | $2,638,483 | $6,423,483 |
| 2016 | $3.910,000 | $2,597,386 | $6,507,386 |
| 2017 | $3.910,000 | $2,461,079 | $6,371,079 |

When performing his land value analysis, Mr. Hoffman did not include the 1.45 acre parcel associated with Lot 4.01.[11]

III. *Conclusions of Law*

Presumption of Correctness

The court's analysis begins with the well-established principle that "[o]riginal assessments . . . are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. Passaic, 100 N.J. 408, 413 (1985) (citing Riverview Gardens v. North Arlington Borough, 9 N.J. 167, 174 (1952)). "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App.

---

[11] In his report, Mr. Hoffman sates the following: "Although the Subject Property's site size of 12.02 acres and improvement coverage lends itself to having surplus land, the current use (Truck Stop) requires a significant amount of paving and area for the movement of larger vehicles and there is no surplus land evident given the subject property's current use. I have included Block 30 Lot 4.01 utility in my valuation of the 12.02 parcel of land as this site's use as a detention basin is considered to have minimal value.

Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. See Pantasote Co., 100 N.J. at 413. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of plaintiff's proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)). "Only after the presumption is overcome with sufficient evidence. . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982)).

The presumption of correctness arises from the view "that in tax matters it is to be presumed that governmental authority has been exercised correctly and in accordance with law." Pantasote, 100 N.J. at 413 (citing Powder Mill I Assocs. v. Twp. of Hamilton, 3 N.J. Tax 439 (Tax 1981)); see also Byram Twp. v. Western World, Inc., 111 N.J. 222 (1988)). The presumption remains "in place even if the municipality utilized a flawed valuation methodology, so long as the

19

quantum of the assessment is not so far removed from the true value of the property or the method of assessment itself is so patently defective as to justify removal of the presumption of validity." Transcontinental Gas Pipe Line Corp. v. Township of Bernards, 111 N.J. 507, 517, (1988).

Only after the presumption is overcome with sufficient evidence at the close of trial must the court "appraise the testimony, make a determination of true value and fix the assessment." Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39, (App. Div. 1982). If the court determines that sufficient evidence to overcome the presumption has not been produced, the assessment shall be affirmed and the court need not proceed to making a value determination. Ford Motor Co. v. Edison, 127 N.J. 290, 312 (1992); Global Terminal & Container Serv. v. City of Jersey City, 15 N.J. Tax 698, 703-04 (App. Div. 1996).

At the close of taxpayer's proofs, the court denied the borough's motion to dismiss the complaints for failure to overcome the presumption of correctness attached to the assessments. The court placed its findings of fact and conclusions of law on the record in the presence of counsel. Those findings and conclusions will not be repeated here at length. Put succinctly, the court concluded that the opinions of value offered by taxpayer's expert, combined with the apparent and credible obstacles to identifying comparable sales of vacant land with the same unique highest and best use and zoning of the property, in addition to the stipulated depreciated cost of improvements, if accepted as true, raise doubt in the court's mind with respect to whether the assessment on the property exceeded true market value for the tax years 2014, 2015, 2016 and 2017.

The court's inquiry, however, does not end here. Once the presumption is overcome, the "court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co., 127 N.J. at

20

312 (quotations omitted). "[A]lthough there may have been enough evidence to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer throughout the entire case . . . to demonstrate that the judgment under review was incorrect." Id. at 314-15 (citing Pantasote, 100 N.J. at 413).

Cost Approach Valuation of Land

There is no single rule or approach to be followed in valuing property. Glen Wall Assocs. V. Wall Township, 99 N.J. 265 (1985); Pantasote Co. v. City of Passaic 100 N.J. 408 (1985). The answer depends upon the particular facts and the reaction to them of experts steeped in the history and hopes of this area. New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537, 544 (1963).

In this matter, the court has accepted both expert's determination that the Cost Approach is the only reliable way to ascertain the true value of the property in question. The Cost Approach is normally relied on to value special purpose property or unique structures for which there is no market. Borough of Little Ferry v. Vecchiotti, 7 N.J. Tax 389, 407 (Tax 1985); Dworman v. Borough of Tinton Falls, 1 N.J. Tax 445, 452 (Tax 1980), aff'd. 180 N.J. Super. 366 (App. Div. 1981), certif. denied, 88 N.J. 495 (1981).

"A cost approach has two elements — land value and the reproduction or replacement cost of the buildings and other improvements." International Flavors & Fragrances, Inc. v. Borough of Union Beach, 21 N.J. Tax 403, 417 (Tax 2004). In the Cost Approach, the value of a property is derived by adding the estimated value of the land to the current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation in the structures from all causes. Depreciation is defined as a loss in value from three causes: physical depreciation, functional obsolescence and external economic factors. See Worden-Hoidal Funeral Homes v. Borough of Red Bank, 21 N.J. Tax 336, 338 (Tax 2004).

21

Land value must be estimated and stated separately in the Cost Approach. Land value and building value may change at different rates because improvements are almost always subject to depreciation. Usually, the most reliable way to estimate land value is by sales comparison. See Appraisal Institute, The Appraisal of Real Estate at 43-44 (14th ed. 2013). Using this approach, an appraiser produces a value indication by comparing the subject property with similar (i.e. comparable) properties. The sale prices of the properties that are judged to be the most comparable tend to indicate a range in which the value indication for the subject property will fall. The Appraisal of Real Estate at 45 (14th ed. 2013). The appraiser estimates the degree of similarity or difference between the subject property and the comparable sales by considering various elements of comparison:

    A. Real property rights conveyed
    B. Financing terms
    C. Conditions of sale
    D. Expenditures made immediately after purchase
    E. Market conditions
    F. Location
    G. Physical characteristics
    H. Economic characteristics legal characteristics
    I. Non-realty components of value.

Dollar or percentage adjustments are then applied to the known sale price of each comparable property to derive an indicated value for the subject property. See Appraisal Institute, The Appraisal of Real Estate at 45-46 (14th ed. 2013). The final step is to reconcile the value indicators into a value conclusion.

When engaging in a sales comparison approach, similarities must exist between the subject property and the comparable properties. "Evidence of comparable sales is effective in determining value only where there is a substantial similarity between the properties." Venino v. Carlstadt

Borough, 1 N.J. Tax 172, 175 (Tax 1980), aff'd o.b., 4 N.J. Tax 528 (App. Div. 1981). By definition, comparability does not require properties to be identical, "differences between a comparable property and the subject property are anticipated. They are dealt with by adjustments recognizing and explaining these differences, and then relating the two properties to each other in a meaningful way so that an estimate of the value of one can be determined from the value of the other." U.S. Life Realty Corp. v. Jackson Twp., 9 N.J. Tax 66, 72 (Tax 1987).

Thus, a fundamental predicate of the comparative approach requires evidence "be based on 'sound theory and objective data,' rather than on mere wishful thinking." MSGW Real Estate Fund, 18 N.J. Tax at 376 (quoting FMC Corp. v. Unmack, 92 N.Y. 2d 179, 188 (1998)). An appraiser must establish appropriate "elements of comparison for a given appraisal through market research and support those conclusions with market evidence." The Appraisal of Real Estate, at 390. Hence, the probative value of the comparable analysis hinges upon the similarities which can be drawn and the objective market data utilized to support adjustments thereto.

It is also recognized that even though the Cost Approach may have an advantage over the Sales Comparison and Income Capitalization approaches when reliable data on comparable sales and rents is scarce, that same lack of data can weaken the credibility of the estimate of land value that is an essential step in the application of the Cost Approach [Appraisal of Real Estate page 568.]

This difficulty in identifying credible comparable land sales though is through no fault of the taxpayer. It is the expert(s) responsibility to identify the best and most credible measures of value available, and as our Supreme Court has cautioned, the cost of litigation in determining the adequacy of the data submitted in support of the expert's value estimates must be considered. Glen Wall Assocs. v. Township of Wall, 99 N.J. 265, 280 (1985).

23

Once the court is satisfied that the expert(s) has complied with this duty, it is the court's responsibility to determine value based on the evidence presented. The lack of comparable sales with the same zoning, or the highest and best use, while problematic, does not in and of itself render the land incapable of being valued by the court.

*VI - Analysis*

<u>Block 30, Lot 4.01</u>

Neither taxpayer's nor the borough's expert specifically valued this property. Taxpayer's expert equated it as having the same value per acre as the land in Lot 3, an assumption not based on the evidence submitted. Additionally, the credible evidence adduced at trial leads the court to arrive at the opposite conclusion – that Lot 4.01has less value than the land situated on Lot 3. The borough's expert did not explore the value of this separate parcel but chose to include it as value to the overall property in Lot 3, and did not calculate a per acre value specifically for it. Additionally, the borough assessor testified that her assessment of this property was at lower value ($125,000 per acre) than the land on Lot 3 ($200,000 per acre). Based on the foregoing, the court finds that the taxpayer has not overcome its burden of proof and the court will affirm the assessment for all four tax years under appeal.

<u>Block 30, Lot 4.01</u>

The court begins by noting that it is fully cognizant of the many cases that stand for the proposition that challenges to real property assessments are unitary and not fractured – a taxpayer must challenge the entire assessment not just the land or just the improvements. Our Appellate Division has held:

Piecemeal challenges to assessments of real property are not permitted except under exceptional circumstances. Separation of land and improvement assessments is simply an "administrative" act that does not relieve a taxpayer from proving a value for his or her property as a whole. See generally In re Appeals of Kents 2124 Atlantic Ave., Inc., 34 N.J. 21, 33-34 (1961); David E. Crabtree, State and Local Taxation, 43 New Jersey Practice, § 5.1 at 58 (1999) (observing that "New Jersey courts have held that the assessments of land and improvements may not be separately contested, thus, the taxpayer may not appeal the land assessment while declining to challenge the improvement assessment or vice versa") (emphasis added); Texas Eastern Transmission Corp. v. East Amwell Township., 13 N.J. Tax 24, 34 (Tax 1992); aff'd, 18 N.J. Tax 126 (App. Div. 1999) (stating that "it has long been recognized that the division of an assessment between land and improvements is an administrative action that does not create two separately contestable assessments").

[Brown v. Borough of Glen Rock 19 N.J. Tax 366, 376-377 (App Div. 2001)]

The land assessment cannot be evidence of value, "the allocation [in a local property tax assessment] between land and improvements being merely an administrative act." N.J. Foreign Trade Zone Venture v. Mt. Olive Tp., 10 N.J. Tax 330, 335 (Tax Ct.1989); aff'd 242 N.J. Super. 170, (App.Div.1990).

The leading local property tax assessment case of In re Appeals of Kents 2124 Atlantic Ave., Inc., 34 N.J. 21, 33-34 (1961), clearly states:

A taxpayer who seeks a reduction of an assessment below true value must prove that his share of the total tax burden substantially exceeds the share allocated to others generally. If his proof does not meet that test, it would be of no moment that the assessment of either his land or his building would be excessive if separately measured against the general treatment of land or of improvements respectively. Indeed he would receive an undue advantage if he could confine his proof in a case of this kind to the treatment of only land or building and have the trier of the facts assume the assessed valuation of the other accords with true value. The burden is his *to establish with independent proofs* the true value of the parcel with its improvements and that the total assessment of the improved

25

> parcel substantially exceeds the ratio of assessment of real property in the taxing district. By the same token, if the taxpayer meets that burden, he is not concerned with such allocation of the resulting figure between land and improvements as may be made administratively for some other purpose. This is not to say that evidence may not be offered as to the value of land and of building separately as a step in the process of proving the total value of land and building as an entity; rather the point is that relief is not warranted unless *the total treatment of the parcel as improved* violates the existing rule of equality.

[Id. at 33-34; emphasis supplied.]

The present case is no exception – and in fact, the taxpayer challenged both the land and the improvement portion of the assessment in all four tax appeals.

This case is simply about the determination of the land value of a unique, special use property, where the depreciated cost of improvements has been successfully determined. That the improvement value was by stipulation is of no importance – the court could have easily made this determination after trial. The difficulty this case presents is how to fairly interpret, analyze, and reconcile the comparable land sales provided by the experts, when those sales by necessity have different zoning and highest and best uses. It would be inequitable to hold a taxpayer to a standard that cannot be met and so the court must apply the law and the facts as they are presented, not as wished.

Zoning is often the most basic criterion in selecting comparables. Sites zoned the same as a subject property are the most desired and appropriate comparables. When sufficient sales in the same zoning category are not available, data from similar categories can be used after adjustments are made. As a general rule, the greater the dissimilarity between the subject and the comparables, the more potential there is for distortion and error in sales comparison. National Westminster Bank New Jersey v. City of Brigantine, 11 N.J. Tax 502, 513 (Tax 1991).

26

All land has value, and the court's review of the comparable land sales offered by both experts is the best evidence available to determine the subject property's land value. In choosing the most credible land sales, the court gives greater weight to those land sales zoned commercial zoning, that are in the Highlands region, and on or near roads or highways with heavy truck volume.

The court finds that the most credible land sales provided by plaintiff's expert (with an additional ten percent for entrepreneurial profit) are sale number 5 ($49,844 per acre), number 6 ($73,052 per acre), and number 7 ($59,400 per acre). The most credible land sales provided by defendant's expert are sale number 1 ($253,479), number 7 ($394,942), and number 8 ($363,636). After weighing probative value of each of these sales, the court concludes a true value price per acre of $200,000.

The court has confidence in its land value determination because it is supported by the current land value contained within the subject property's assessment. Although as a general rule, the land assessment cannot be evidence of value because the allocation between land and improvements is viewed to be merely an administrative act, the evidence in this case was presented differently. The testimony of the borough assessor clearly and unequivocally was that the land assessment was based on a $200,000 per acre value attributed to a 2006 revaluation formulated by Appraisal Systems using the Cost Approach. The $200,000 price per acre was not therefore arbitrary or merely an administrative act. Also land values do not change at the same rate as improvements because depreciation is not a factor. So while not dispositive of value, the court cannot conceive of any reason why given the assessor's testimony, the land assessment cannot be considered as supporting the other credible evidence establishing value.

When the court's conclusions of land value are added to the stipulated depreciated replacement costs, the conclusion of true market value on the relevant valuation dates is as follows:

| Tax Year | Land | Improvements | Total |
|----------|------|--------------|-------|
| 2014 | $2,404,000 | $2,647,350 | $5,051,350 |
| 2015 | $2,404,000 | $2,638,483 | $5,042,483 |
| 2016 | $2,404,000 | $2,597,386 | $5,001,386 |
| 2017 | $2,404,000 | $2,461,079 | $4,865,079 |

Applying Chapter 123

Pursuant to N.J.S.A. 54:51A-6 (a), commonly known as Chapter 123, in a non-revaluation year an assessment must be reduced when the ratio of the assessed value of the property to its true value exceeds the upper limit of the common level range. The common level range is defined by N.J.S.A. 54:1-35a(b) as "that range which is plus or minus 15% of the average ratio" for the municipality in which the subject property is located.

Pursuant to N.J.S.A. 54:51A-6 (c), if both the average ratio and the ratio of the assessed value of the subject property to its true value exceed the county percentage level,[12] the tax court shall enter judgment revising the taxable value of the property by applying the county percentage level to the true value of the property. Applying these statutory provisions, the court will round the

---

[12] The county percentage level in all cases is 100%. M.I. Holdings, Inc. v. Jersey City, 12 N.J. Tax 129, 145 (Tax 1991).

true value figures for the subject property for tax years 2014 and 2015 and enter judgment as follows:

| Tax Year | Land | Improvements | Total |
|---|---|---|---|
| 2014 | $2,404,000 | $2,650,000 | $5,054,000 |
| 2015 | $2,404,000 | $2,640,000 | $5,044,000 |

Tax Years 2016 and 2017

The calculation for tax year 2016 is as follows: $5,821,800 ÷ $5,001,386 = 1.164. The Chapter 123 average ratio for Bloomsbury Borough for tax year 2016 is .9557 with an upper limit of 1.0991 and a lower limit of .8123. The ratio for the subject property for this tax year is 1.164, which exceeds the upper limit of the range for this tax year. Consequently, the court will determine the assessment for the subject property for tax year 2016 by multiplying the true value by the Chapter 123 ratio: $5,001,386 x .9557 = $4,779,825.

The calculation for tax year 2017 is as follows: $5,821,800 ÷ $4,865,079 = 1.196. The Chapter 123 average ratio for Bloomsbury Borough for tax year 2017 is .9348 with an upper limit of 1.075 and a lower limit of .7946. The ratio for the subject property for this tax year is 1.196, which exceeds the upper limit of the range for this tax year. Consequently, the court will determine the assessment for the subject property for tax year 2017 by multiplying the true value by the Chapter 123 ratio: $4,865,079 x .9348 = $4,547,876.

The court will round the true value figures for tax years 2016 and 2017 and enter judgment as follows:

| Tax Year | Land | Improvements | Total |
|---|---|---|---|
| 2014 | $2,404,000 | $2,376,000 | $4,780,000 |
| 2015 | $2,404,000 | $2,146,000 | $4,550,000 |

/s/ Mary Siobhan Brennan, J.T.C.